UNITED STATES COURT OF FEDERAL CLAIMS


Roger Birdbear, et al,          )
                                )
            Plaintiffs,         )
                                )
            vs.                 )   File No. 1:16-cv-00075-EDK
                                )
United States of America,       )
                                )
            Defendant.          )



TRANSCRIPT OF CLOSING ARGUMENTS




Taken at
United States Courthouse
Grand Forks, North Dakota
May 22, 2024




BEFORE THE HONORABLE ELAINE D. KAPLAN
-- UNITED STATES COURT OF FEDERAL CLAIMS CHIEF JUDGE --




Sandra E. Ehrmantraut, Certified Realtime Reporter
seehrmantraut@gmail.com
Proceedings Recorded by Mechanical Stenography
Transcript Produced by Computer-Aided Transcription

APPEARANCES


      MR. JOHN J. STEFFENHAGEN
      MR. BRIAN W. NELSON
      MR. TERRANCE W. MOORE
      MR. RYAN M. THEIS
      Hellmuth & Johnson, PLLC
      8050 West 78th Street
      Edina, Minnesota  55439


                                      FOR THE PLAINTIFFS


                  - - - - - - - - - -


      MR. NICHOLAS McDANIEL
      MR. THOMAS A. BENSON
      U.S. Department of Justice
      P. O. Box 663
      601 D Street Northwest
      Washington, DC  20004-0663


                                      FOR THE DEFENDANT


                  - - - - - - - - - -


Certificate of Court Reporter - Page 91


                  - - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2    Honorable Elaine D. Kaplan, United States Court of Federal

3    Claims Chief Judge, presiding, commencing at 10:30 a.m.,

4    Wednesday, May 22, 2024, in the United States Courthouse, Grand

5    Forks, North Dakota.  The following proceedings were had and

6    made of record in open court.)

7                    - - - - - - - - - - -

8          THE COURT:  Mr. Steffenhagen, do you want to proceed

9    with your argument?  I've allocated an hour per side.  I'd like

10   to keep to that to the extent possible, but it's not a hard,

11   you know, deadline the way it would be in a Court of Appeals or

12   in the Supreme Court.

13         MR. STEFFENHAGEN:  Thank you.  May it please the

14   Court, counsel.  My name is John Steffenhagen, and it's been my

15   privilege in this case to represent members of the Birdbear

16   family.  I'd first like to introduce my colleagues and

17   co-counsel.  From Your Honor's right to left, Brian Nelson,

18   Terry Moore, and Ryan Theis.  Also present are a number of very

19   important people, including my clients.

20         Your Honor, when trial began, the first sentence in

21   my opening statement was that this case is about a fundamental

22   breach of trust in it, but in retrospect I hadn't earned the

23   right at that time to talk about trust.  I learned a clear fact

24   as I tried this case, as I crossed time zones, and I

25   cross-examined the government's employees, as I pored through

3

1    documents and reconstructed a deeply troubling picture from
2    2010 and thereafter.  And most importantly, as I listened
3    deeply, intently and carefully to my clients, I learned that
4    trust is a relative term.
5        To about half the people in this room, trust is a
6    bird branch.  I can trust that I can walk into virtually any
7    room and not be judged.  I can trust that whatever goods I have
8    in life are going to find a market so that I can provide for my
9    family.  I can trust that any assets that I can garner in life
10   I'll be able to control and manage.  These forms of trust are
11   all similar.  They're based on autonomy.  They're based on, I
12   can trust myself because trust, after all, is a pillar of
13   self-reliance, which is the American ideal.
14       My clients view trust in a different way.  My clients
15   are four siblings and their uncle, Nelson Birdbear.  Their
16   father, Roy, was adopted.  Their mother, Rosalie, was Arikara.
17   Now, in the Hidatsa language there is no word for trust.  They
18   don't have it.  Instead, trust is a concept to the Hidatsa
19   people.  The closest rendition is afraid.  Maa aru cáawi aru
20   gaadí, that in the native Hidatsa tongue and what that means is
21   the established, true, real rules, ways that people are to
22   follow in society.
23       Now, it is telling, it is fitting that the Hidatsa
24   people don't find the need to reduce "trust" to a word.  To
25   them it's a concept, it's a way of life, it's the real way to

4

1    live one's life.  It is fitting as well, indeed, we can say it

2    is poetic justice that after generations, after centuries, the

3    government today in this courtroom is held to something very

4    akin to the Hidatsa standard of trust, the right and true way

5    to live your life.

6            Now, the law is clear.  The government's employees

7    bore the highest possible fiduciary duty.  The government's

8    employees down to the North Dakota field office level were

9    required by law to treat my clients' mineral resources as

10   though they were their own, no less authority than -- the

11   United States Supreme Court has held that these duties are so

12   profound that they are moral, moral, the right and true way to

13   live your life, moral in depth and scope.  Those duties are, of

14   course, through statutes, regulations, operational manual, all

15   implemented to achieve one overriding primary purpose, to

16   maximize the best economic interest of the Birdbears.

17           Now, these are not practices.  These are not

18   aspirations.  These are not options for the government.  They

19   are strict legal requirements.  By law the Birdbears, who have

20   held allotted tracts for generations, literally could not make

21   their own economic decisions regarding their mineral interest.

22   It was a form of federal conservancy, if you will.

23   Historically they were not trusted with a lot of things.

24           And to be clear, allotments are not granted as a

25   stroke of benevolence to these people.  Allotments were granted

1    to pulverize Indian culture.  And, therefore, the generations

2    that ensued after the General Allotment Act in 1868, there has

3    been one attempt after another, depriving mineral resources

4    from people who literally could not defend those resources

5    themselves.

6           Now, history proved that if United States knew that

7    it was consigning what it called the Three Affiliated Tribes to

8    this patch of land and knew that that patch of land happened to

9    sit about 10,000 feet above the richest mineral reserve in

10   North America, it wouldn't have happened, but it did.  And

11   during the Bakken oil boom, enhanced drilling techniques opened

12   up the potential for this multi-billion, not million,

13   multi-billion opportunity for allottees.

14          So oil company operators did what it is their nature

15   to do.  They descended in droves.  They knew the signage to a

16   tee.  They knew what drainage did.  They knew every angle, and

17   they were willing and did take every slipup, every opportunity

18   that they could seize.  At this point the Birdbears needed the

19   government to do its job.  The Birdbears needed vigilance.

20   They needed action.  They needed regulation.  They needed the

21   vast authority and might of the federal government to deliver

22   on promises that had been generations in the making.  They

23   needed, in a word, vigilant, intelligent, attentive,

24   sympathetic trustees.  They didn't receive it.

25          What they received instead was pervasive and

6

1    crippling operational failure.  They received trustees in the

2    nominal sense who routinely sided with oil company operators,

3    the very entities that they were charged to regulate.  They

4    received instead resentment, depredation in Allen Ollila.

5            In the first of my closing, I'm going to address four

6    areas in turn; first, the failure to diligently develop the

7    Birdbears' tracts; second, the failure to prevent and

8    compensate the Birdbears for drainage; third, the failure to

9    prevent and compensate the Birdbears for venting and flaring of

10   gas; and fourth, the monetary and nonmonetary relief that will

11   help deliver justice in this case and right this case.  I'm

12   going to reserve time for as well closing observations and

13   conclusions.

14           But first, diligent development, defendant's

15   violation of its trust obligations can be addressed in six

16   summary points, each of which leads to precisely the same

17   conclusion.

18           Point number one, the purpose of the law is to

19   prevent the strong from always having their way.  Now, I was a

20   growing boy several millenniums ago, but he hit that one just

21   solidly.  That's what the law is.  That's specifically what

22   this law is, to prevent the strong from always having their

23   way.  That is why the money and the obligation existed to

24   maximize the Birdbears' best economic interests.

25           25 CFR Part 212, for example, gives the Secretary of

1    the Interior pervasive authority over the administration of
2    leases and the development of leasehold interests.  Those
3    leases themselves contractually require oil company operators
4    to diligently develop the leases.

5        25 CFR Part 212.1, in fact, says Indian mineral
6    owners desiring to have the resources developed are assured –
7    assured – that they will be developed in a manner that
8    maximizes the best economic interest and minimizes any adverse
9    environmental or cultural impact.  That's the law.  That's the
10   standard.  That is the right and true way to live.

11       43 CFR includes parallels and complimentary
12   regulations, including requiring drilling and requiring
13   compensatory royalties.  At an operational level the Indian
14   diligent development manual says, at least at face value, that
15   it is intended to assure the development of producing Indian
16   oil and gas leases in an orderly and timely manner.  We have
17   decades of case law to the same point.

18       *Mitchell II*, for example, addressed the management of
19   timber.  The Shoshone Indian Tribe in Wind River, timber was
20   analogized to oil and gas, so what we have is an interlocking
21   scheme of statute, regulation, operational manual and case law.
22   The common denominator of this comprehensive legal framework is
23   clear.  The government's job, their duty, their obligation was
24   to maximize and protect my clients' resources because my
25   clients couldn't do that themselves.

8

1          THE COURT:  Can I -- can I just ask you a quick
2     question?
3          MR. STEFFENHAGEN:  Certainly.
4          THE COURT:  In terms of fiduciary obligation, if
5     the -- if the facts were to show that the government acted
6     consist with the diligent development manual, would that
7     necessarily mean that -- that they had complied with all of
8     their fiduciary obligations with respect to diligent
9     development?
10         MR. STEFFENHAGEN:  No, it absolutely would not, and
11    for this reason.  This fiduciary standard is not something that
12    the government is entitled to define themselves.  That'd be to
13    -- the analogy would be that the fox is guarding the hen house.
14    That's not their call, so when they develop a diligent
15    development manual, they are subject to a higher authority.
16    That higher authority is immediate level -- is Your Honor.
17    It's the court system.  It's a court of law.  That higher
18    authority is the -- not century, decades of case law that
19    define the high fiduciary duty that they have.
20         So if the government stands here today and says that,
21    "We complied with our manual," the answer to that is you were
22    required to comply with a higher authority, and that's the law.
23         THE COURT:  Well, but doesn't -- aren't they sort of
24    the -- I guess I understand that if the manual itself is flawed
25    in some way, it doesn't protect the interests of your clients

1  sufficiently to meet the government's fiduciary obligation.

2  That would be one way to show there was a breach of fiduciary

3  obligations.  But the other way I would think would be assuming

4  that the manual itself, if complied with, would have satisfied

5  the government's fiduciary obligations, then you have to show

6  that they didn't comply with the manual.  Am I correct?  I

7  mean --

8          MR. STEFFENHAGEN:  What the -- what the Court is

9  saying is correct because there's a couple different ways to

10  prove that they violated a fiduciary duty.  At a base level, if

11  they violated their own manual, and they did repeatedly and

12  without thought, then the Court can look at that and say you

13  violated the very duty that you defined for yourself.  That's

14  level one.

15          Level two is even if they complied with their own

16  manual, it's not their call what the standard is.  That's a

17  fiduciary standard.  It'd be like if there was a fiduciary

18  managing, let's say, a trust that was comprised of nothing but

19  money, and that fiduciary was to develop rules for itself.  And

20  even if that fiduciary followed those rules and managed --

21  let's say it's a money market account, managed those roles

22  correctly and was still negligent and violated a fiduciary duty

23  and lost money for beneficiaries, no trustee would be able to

24  stand in court and say, "I followed my own rules."

25          Point two regarding diligent development, "a page of

10

history is worth a volume of logic," Oliver Wendell Holmes.
This is a way of saying that the United States did not enter
the Bakken boom with a clean slate.  By 2010, give or take,
when oil production began to shift into a higher gear, the
General Allotment Act had been in place for about 150 years.
Courts had addressed and some had even, to be honest, fostered
efforts to separate allottees from their mineral resources.

The theft of Indian resources was well-known,
including in the Osage lands in the 1920s.  Government study
and report all highlighted and underscored the lack of
commitment and resources that our government had devoted to
Indian matters.  The United States, this trustee of mineral
resources, had every conceivable notice and ability to be
vigilant and to be protective and to be industrious.  It knew
these pages of history that Oliver Wendell Holmes talked about
because the government wrote most of those pages.

Point three, "cross-examination is the greatest legal
engine ever invented for the discovery of the truth," John
Henry Wigmore.  That's one that I'm sure Your Honor has heard.
It's one I ascribe to because it's true.

As our team pored through these hundreds of thousands
of pages, a disquieting theme had emerged.  The Bakken boom by
that time was done and gone.  Our clients had already been
severely, severely damaged.  The task was to -- essentially to
conduct a postmortem, if you will, and it was to show how and

11

1   why the government failure -- failed.

2          Now, from those disperse and seemingly separate

3   pieces of evidence, despite the inferences crystalized into

4   plain fact, defendant not only failed its trust obligation to

5   conduct, but it failed to act upon diligent development review.

6          Mr. Ollila was at the front of these failures.

7   Mr. Wigmore's -- or Professor Wigmore's observation regarding

8   cross-examination held true with respect to Mr. Ollila.  He sat

9   about 12 to 15 feet to the right of the chief judge of the

10  United States Court of Federal Claims and was dismantled and

11  deconstructed.  His paper trail of e-mails and

12  cross-examination exposed him, and it did get dusty.

13         This was defendant at an operational level, as

14  expressed in documents that it thought would never see the

15  light of day.  This is how Mr. Ollila felt.  This is how he

16  acted.  This is how he behaved.  This is how he thought of my

17  client in realtime and while millions of dollars of damage was

18  occurring on his watch.

19         For example, he testified that he knew nothing about

20  the North Dakota field office's exemption from the trust

21  obligation of diligent development until I showed him his

22  e-mail in which he said it.  He then testified that he had

23  never seen a document, a memo produced by the government that

24  references this same exemption from trust obligation.  And the

25  government seized on that and says it can't be admitted because

1  there's no foundation.  When Your Honor ordered that the e-mail

2  that appended that attachment be produced, who drafted the

3  e-mail that attached that exemption notice?  Mr. Ollila.

4          THE COURT:  Now, I -- I don't know if I have it in

5  front of me, but I'm not sure if he's the one who sent -- if

6  he's the one who sent that memo or whatever that was or if it

7  was sent to him.

8          MR. STEFFENHAGEN:  He is the one -- I forget the

9  exhibit number, but he is the one who sent the e-mail that

10  attached the memo.

11          THE COURT:  Okay.  423A, and it's -- there's an

12  e-mail from Diane Frieze, I guess, to Mr. Ollila, and it says,

13  "I am returning this to you so you can complete additional

14  analysis on whether to eliminate this position."  So I thought

15  that meant she was give -- she was sending it to him.  I mean,

16  it may not make any difference, but --

17          MR. STEFFENHAGEN:  Right.  The way we read that

18  e-mail -- and it's hard because it was produced during the

19  trial.  If you look at the top e-mail, it is from Mr. Ollila.

20  The attachment appears to be to that e-mail, but I'm going to

21  -- here's the point to make, if it was him, it's bad; if it's

22  his boss, it's worse, so either way.  The point is that this

23  was something he denied, denied and denied, but the paper trail

24  proved otherwise.

25          Now, how did Mr. Ollila eventually refer to this

1   exemption from trust obligations?  This was a question posed to

2   him.  "Would you personally ever send out letters to operators

3   under the diligence program?"  And he answered, "Yes, every

4   case that was not fully developed, we sent out a letter up

5   until that magic date."  Up until that magic date, in a case

6   where the Birdbears have lost millions, Mr. Ollila was

7   systematically reduced to magic date when he was cornered on

8   cross-examination.

9        Now, this is, of course, not all.  There are, by the

10  way, no 60-day letters in evidence other than extremely

11  problematic ones for the government itself.  They didn't follow

12  the 60-day rule at all.

13       There are other violations as well.  Mr. Ollila

14  complained in an e-mail -- would you take that down?

15  Mr. Ollila complained in an e-mail that he was required to keep

16  by the Washington office, keep the database of diligent

17  development reviews.  We found that database.  We gave it to

18  Mr. Ollila on the stand.  He authenticated it.  And that

19  database had virtually nothing with respect to diligent

20  development, including of Birdbears' tract.

21       When BLM employee, Jack Wunder, noted diligent issues

22  in a draft report, Mr. Ollila asked him to take it out.  And

23  Mr. Wunder did for the sole reason that that would have raised

24  issues and questions with a lot of people like the Birdbears.

25  In fact, the government in this case and during trial failed

14

1    even to introduce one diligent development review of any

2    Birdbear tract.  The government, indeed, was reduced to

3    attempting unsuccessfully to submit into evidence a diligent

4    development review of a tribal tract.

5        Now, the pivotal question posed by the government to

6    its own witness, Mr. Ollila, "To your knowledge, did BLM ever

7    find a lack of diligence on any of the Birdbear tracts?"  Now,

8    in trial advocacy, this is the same thing as a batting practice

9    pitch.  This is a slow pitch that you throw up hoping that your

10   witness will crush it.  He didn't.  He struck out.  His answer

11   was, "I don't remember."

12       To put this in context, with the benefit of

13   hindsight, with the benefit of preparation from the Department

14   of Justice, with the benefit of looking over all of his

15   documents, Mr. Ollila went on the stand, in cross-examination

16   could not identify any either times it complied or times that

17   they didn't comply.

18       THE COURT:  Well, I mean, he had been retired for

19   about five years, I think, or seven years maybe by the time of

20   the trial, so could it be that he just didn't remember?

21       MR. STEFFENHAGEN:  It's -- it's always possible, and

22   human nature is that way, but I'll phrase it this way.  If you

23   were to ask me what I had for lunch ten days ago, I wouldn't be

24   able to tell you, or maybe I could, and it'd be pretty bad, one

25   of several fast-food restaurants, but that's not this case.

1          This trial was about Allen Ollila and the BLM
2     failure.  They knew beforehand precisely what the issues were
3     going to be at trial.  It came out on cross-examination.  They
4     prepared him.  They gave him documents, but they didn't give
5     him a diligent development review.  They didn't have any.
6          So, yeah, the human nature is that people can forget,
7     but this was not a run-of-the-mill, ordinary, day-to-day event.
8     This was a trial in federal court, and this was a trial over
9     millions of dollars.  If anyone had an incentive to prepare and
10    remember and to jog his own memory, it would have been
11    Mr. Ollila.
12         Now, my clients --
13         THE COURT:  So are you suggesting that he was being
14    untruthful, or --
15         MR. STEFFENHAGEN:  There are different ways to be
16    untruthful, and that's not a squirmy lawyer answer.  It's human
17    nature.  There's a way to be untruthful where you say something
18    that you know is a hundred percent wrong, and it's possible,
19    very possible, that that's what Mr. Ollila did.  It's possible
20    too to be untruthful when you know the subject under
21    examination and you don't refresh yourself, you don't prepare
22    with your witnesses.  You understand -- you've been deposed.
23    You know what the issues are.  So to be untruthful, yes, you
24    can be untruthful if you blindly turn your eye to what the
25    issue is.

1          But too this was such a conspicuous event that this

2   is not something that could simply slip from a person's memory.

3   This was key.  This is how my clients were damaged again and

4   again.  So to say that even "I don't recall," that's the same

5   as an admission that it didn't happen.

6          Now, these too were not the only failures.  My client

7   repeatedly requested information from the government, and

8   Mr. Ollila didn't provide it.  He said that Roger Birdbear had

9   no clue when Mr. Birdbear asked for samples of oils from wells

10  that were producing on his property.  He failed to produce

11  pressure data when my clients requested it.  Let's put this in

12  perspective.  These were the Birdbears' tracts.  They were the

13  trust beneficiaries, and the BLM failed to produce information

14  to them.

15         Now, Mr. Laborda turned out to be an excellent

16  witness for the plaintiff on reservoir engineering, but with

17  respect to diligent development, it was interesting.  He was

18  not on their witness list either, will call, may call,

19  rebuttal, but they brought him onto the stand after Mr. Ollila.

20  And all of a sudden Mr. Laborda identified, well, there were

21  two databases of diligent development review.  What they're

22  saying is that the most technologically advanced nation in the

23  history of Planet Earth can't find the database.  That too is

24  telling.

25         They failed to process applications, applications for

17

1  permits to drill, communitization, venting and flaring,
2  right-of-ways.  These failures were endemic.  It resulted in
3  years of backlog, and it resulted in chaos.  So what are we to
4  make of this effort, this and the great breadth of other
5  evidence we produced?

6         There -- there is a scientific principle called
7  Occam's razor.  That premise holds that the simplest
8  explanation, the one that requires the fewest assumptions, is
9  usually correct.  The simplest explanation regarding diligent
10 development in this case, given this evidence, given their
11 witnesses, is that they didn't conduct diligent development
12 review, or if they did conduct any, they were so scant and so
13 cursory that they have now vanished without a trace, without
14 remembrance, and most certainly without taking one step to
15 enforce against oil company operators, my clients' rights.
16 Now, this left my client to market forces that were dictated by
17 the oil company operators.

18        There's a quote from Justice Cardozo.  A trustee is
19 held to something stricter than the morals of the marketplace.
20 One thing I found about Justice Cardozo's opinions between my
21 engagement work study and law school in DC was he had a elegant
22 quote for virtually everything.  While this is not a trust
23 construct, but it's true.  What this says is that a trustee
24 can't trust the marketplace, and that's particularly true in a
25 case in which the marketplace is adversarial, not

1    complimentary, adversarial in most respects to trust
2    beneficiaries.

3          You can take that down, please.

4          THE COURT:  Yeah, let me ask you a question about
5    that, and that's probably just a -- it's probably just a
6    simpleminded, naive question, but the question is -- there's a
7    lot of discussion about, you know, the oil companies and that
8    they -- their interest was adverse to -- adverse to the
9    allottees.  But if we're talking about diligent development,
10   isn't it in the oil company's interests to develop their
11   leases?  So wouldn't their interests be sort of aligned with
12   the allottees?  Are their circumstances where it's not in their
13   interest to develop a lease?

14         MR. STEFFENHAGEN:  I'll give you what may seem like
15   another squirmy lawyer answer, but the answer to that one is
16   that there are two different forms of that as well.  If you
17   think of a company like Chevron, their interest is in making as
18   much money as they possibly can with the lowest possible
19   overhead and the lowest possible government regulation.  That's
20   what they do.  That's what multi-billion-dollar, sophisticated
21   companies do, and that's why they have securities filings that
22   talk about their oil reserves and how much they're worth.
23   That's how they are motivated.

24         They are not motivated to take care of Roger
25   Birdbear's tract.  If they could derive a higher profit by

19

1   draining from Roger Birdbear's tract, that's what they're going

2   to do.  If they could make a higher profit by drilling one

3   well -- one well in a spacing pattern that was subject to a

4   communitization unit, that's what they were going to do.  If

5   they could hold over expired leases in a spacing pattern in a

6   communization agreement, which happened in this case, that's

7   what they would do.

8         So, no, the oil company operators, the Chevrons of

9   the world cared about themselves, and if it happened to align

10  with Roger Birdbear and the folks that I'm representing, then

11  that was a line item on a spreadsheet of costs that they had to

12  pay.  Let's make no mistake, they were not in this for my

13  clients.  They were in it for themselves.

14        THE COURT:  Well, I don't doubt that.

15        MR. STEFFENHAGEN:  Pardon me?

16        THE COURT:  I said I don't doubt that.  I just -- you

17  know, I understand what you're saying.  There's going to be

18  circumstances where there might be a different interest in the

19  oil companies in taking an action that's not in the interest of

20  the allottees.  I get that, but -- don't worry, I understand

21  what Chevron is interested in.

22        MR. STEFFENHAGEN:  You know, part of my job is

23  sometimes to speak the truth, and sometimes the truth is

24  obvious and it seems simplistic, but it is so true in this

25  case.  There was no compunction if it meant cheating my client

1   out of mineral resources.  If they could drain oil and not pay

2   for it, there goes their overhead and up goes their oil

3   reserve, and their stockholders are thrilled.

4           So Justice Cardozo, that -- that's the trustee's

5   obligation.  Defendant failed to do that, and it failed

6   repeatedly.

7           Point four, the why of defendant's endemic trust

8   violations.  Now, in order to prevail, in order to prove our

9   case, we don't have to prove why the government failed and

10  failed miserably and repeatedly in its trust obligation, but

11  we've done that too.  We have proven the why.

12          As our team went through those hundreds of thousands

13  of pages, another disquieting theme arose, and that was open

14  resentment that Allen Ollila hid from the people that he was

15  hired to protect.  These are just some of the quotes, and I

16  won't even quote them all because Your Honor has seen them

17  before.  This is Allen Ollila in unvarnished terms in

18  communication he thought would never see the light of day.

19  This is how he thought.  This is how he acted.  This is how he

20  treated these folks.

21          "Not going to drop everything and jump when they ask.

22  Roger Birdbear was throwing a lot of things at the wall trying

23  to get information that he thought might help him get money."

24  That, by the way, was trial testimony, not an e-mail.  That was

25  trial testimony.  It's as though he could not help himself when

1    he was sitting to your right.

2            "If I do an analysis on this again, I'm going to

3    puke."  This ironically referred to tracts in which drainage

4    occurred.  And, of course, "Are you sitting at Hooters?"  The

5    answer from his -- it looks like superior, "At the strip club."

6    This -- this is what was standing between my clients, who

7    couldn't defend themselves, and economically voracious oil

8    company operators.  This is how the trustee abandoned the moral

9    duty and the high fiduciary duty that they owed.

10           Now, in a vain attempt to explain these sorts of

11   comments, the government alleged in its brief that, well, I

12   don't allow for the possibility that he was joking.  They're

13   right in this.  I -- I don't allow for that.  He was their

14   witness.  He was on their witness list.  They had him on the

15   stand.  If they thought that there was some explanation for

16   this discreditable conduct, they could have asked him, and they

17   didn't.  What they wanted was to get Mr. Ollila off the stand

18   as quickly as they possibly could.  This is repugnant to a

19   trust obligation.  This is resentment at the most base level.

20           Point five, the cursory work of defendant's usual

21   team of experts.  Into this breach, both figurative and

22   literal, stepped a team of experts who the government routinely

23   hires in mineral rights cases against indigenous people.  If I

24   sat down with a blank legal pad, I could not have come up with

25   a composite of more stereotypical, establishment-tested oilmen

1    than Mr. Payne, Mr. Reynolds and Mr. Martin.

2            They have made a career, millions upon millions of

3    dollars representing and advocating on behalf of the Department

4    of Justice against folks just like you're seeing in this

5    courtroom.  By my calculation, for example, Ronnie Martin

6    charged $95,000 for every page of the 24 pages of my

7    cross-examination.  This is transactional to them.  This is

8    result-driven to them.  This is experts that have been bought

9    and paid for in a literal and figurative sense.

10           And what every trial does is presents distinction.

11   They went to their go-to team, but even then if we think about

12   what Mr. Payne said with respect to diligent development, it

13   wasn't cursory.  He knew that Mr. Akinboyewa had identified 16

14   separate tracts.  He knew this.  He knew precisely what

15   Mr. Akinboyewa said was wrong with the development on those 16

16   tracts.  He had every opportunity on the stand to go through

17   those tracts with tract-by-tract analysis and explain how

18   conceivably the BLM did its job, and he didn't.  He didn't.

19           What he did do is come up with a list of hypothetical

20   problems, including winters in North Dakota, right?  As a

21   lifelong Minnesotan, I know it gets cold, when Mr. Payne's

22   résumé trumpets the fact that he's an expert in deepsea oil

23   drilling, and then he admits that drilling went on 24/7, 365.

24   So they talk in generic terms.

25           But we know though too, and this came out not in

23

1   direct examination by the government but in cross-examination,

2   Mr. Payne did do a diligent development analysis of some sort

3   because he told Mr. Martin that there were lost volumes due to

4   diligent development, and Mr. Martin then computed that amount

5   at $665,150.  Now, that's what's fascinating to me, because

6   that never came out on direct.  So what happened was even

7   defendant at that point objected to the introduction

8   unsuccessfully, as it should be, objected to the introduction

9   of their own damages theory.

10       So what specific tract did Mr. Payne find had not

11  been diligently developed?  The government won't say.  How did

12  he derive the volume that Mr. Martin computed?  He won't say

13  that either.  Now, these are not rhetorical questions.  These

14  are questions that go to the credibility to whether this Court

15  should accept any of the government's alleged evidence

16  regarding diligent development.

17       Point six, bringing chaos -- excuse me, bringing

18  order to defendant's chaos.  When you have a conglomeration of

19  problems that appear to be unsolvable in concept, in -- in

20  conglomeration, what you do is break it down to its smallest

21  constituency.  You do, in other words, precisely what

22  Mr. Akinboyewa did.  What he did is meticulous resource -- he

23  did meticulous research, and he reconstructed events and

24  conditions as they occurred in realtime and as development was

25  happening on the Bakken.

1        For example, this is one -- just one of the extremely
2    detailed maps that Mr. Akinboyewa prepared.  So when I say he
3    recreated past events, what he did is meticulously go through
4    every surrounding well.  The plaintiffs' tract is M2255.  He
5    went and meticulously recreated when those competing wells
6    first produced.  He recreated and documented how much oil those
7    competing wells had produced up to the day of his analysis.  He
8    computed the volumes of lost gas.

9        So from this documentation he could make a
10   scientifically accurate and logical apples-to-apples
11   comparison.  And he could opine and conclude that if you look
12   at everything happening around him, 2255, it is a networking
13   spider's web of development with that tract standing alone.
14   That's a failure to diligently develop.

15       Now, in the government's brief they identified, I
16   think, one tract, and they say, "Well, how was it as of this
17   year?"  What the government never does is go through
18   meticulously as Mr. Akinboyewa did and document all of this and
19   put it in realtime so that this Court was deciding apples to
20   apples in terms of diligent development, utilizing not just
21   actual production, but utilizing technology as they existed as
22   of that date.

23       THE COURT:  What is your response to the government's
24   argument that Mr. Akinboyewa didn't consider -- consider the
25   prudent operator rule in its determination as to which, you

1    know --

2              MR. STEFFENHAGEN:  Say what again?

3              THE COURT:  Yeah, that he didn't consider the prudent

4    operator rule; in other words, he didn't provide an analysis of

5    the economic conditions that would support his conclusion that

6    more wells should have been drilled.

7              MR. STEFFENHAGEN:  The quick answer, and then I'll

8    give you a longer one.  The quick answer is they're dead-flat

9    wrong, that the more involved answer is that the best

10   indication that these wells would have been economically viable

11   is that you look at the wells that oil companies operated

12   voluntarily, voluntarily, with no evidence that they were

13   forced to drill any of these, that they voluntarily concluded

14   themselves were economically viable, that they concluded

15   themselves met the prudent operator rule.

16             In fact, it's clear the BLM didn't understand in

17   realtime the prudent operator rule itself because Mr. Ollila is

18   the one who said, "Well, we had the burden to prove that the

19   well would be economic."  He's got the law absolutely

20   diametrically 180 degrees wrong.  It's the oil company operator

21   who has the burden to prove that a well would be noneconomic.

22   But they not only get the facts wrong, they got the law wrong,

23   and these were people in realtime who were making decisions

24   that affected my clients.

25             THE COURT:  So you're saying that Mr. Akinboyewa

1  didn't have to -- that he didn't have to show that the prudent

2  operator rule was met because the burden was on the oil company

3  to show that -- it would be on the oil company to show that it

4  was not?

5           MR. STEFFENHAGEN:  That's one point, but --

6           THE COURT:  Yeah, I know there was the first part,

7  which is that if the wells were being drilled on adjacent

8  property at a certain level, then you could almost assume that

9  they're economical because why would the oil company be

10 drilling them, right?

11          MR. STEFFENHAGEN:  If they wanted to rely on market

12 forces, then they can't have it both ways.  If you want to rely

13 on market forces in some respects so that they can operate

14 without guardrails, then you accept market forces show that the

15 substantial, huge, huge volume of drilling on the Bakken

16 voluntarily by oil company operators all around my clients'

17 tract, that's the definition of failure to diligently develop.

18          And if you want to take it even a step further, Mr.

19 Payne, Mr. Reynolds and Mr. Martin didn't do any economic

20 analysis themselves.  They simply threw it out there that there

21 wasn't an economic analysis without looking at the facts,

22 without looking at their misinterpretation of the law, without

23 considering the circumstances.  So, yes, the wells could and

24 should have been drilled, and it shows again a basic failure.

25          Now, before I move on, that there is a -- any trial,

1    advice comparison, comparison in terms of -- comparison in

2    terms of witnesses.  So it was with the expert witnesses in

3    this case.  Now, Mr. Payne, Mr. Martin and Mr. Reynolds were

4    slick and polished.  I'll give them that, but I don't intend

5    that as a compliment.  This was Mr. Akinboyewa -- was his first

6    time testifying as an expert witness.  He was knowledgeable.

7    He was credible.  He was thorough.  He was engaging.  He was

8    excited about the subject matter.  An expert witness like that

9    is not going to sacrifice science for the sake of results.  We

10   welcome that comparison.

11          Moving to drainage, the drainage analysis starts with

12   a simple premise.  Defendant cannot stand on what's unknown.

13   It's that plain.  The physics of drainage have been known for

14   generations, that oil company operators know exactly what it

15   is.  They know exactly how it occurs.  They know exactly how it

16   happens and what factors measure into it.

17          Even a 2007 movie with Daniel Day-Lewis, yet drainage

18   -- essentially correct when he says it's like drinking your

19   milkshake.  That's what drainage is.  Everybody knows what

20   drainage is, and that's why these laws exist, to protect

21   against drainage.

22          Now, cases that involve scientific evidence sometimes

23   are interesting character studies.  They're interesting because

24   if this was a jury trial, before Your Honor sends out the jury,

25   you would instruct that jury to take into their deliberation

1    their commonsense and their life experiences.

2              But what happens when there are no life experiences

3    against which to measure scientific evidence?  What happens

4    when the factfinder is for the first time learning a subject

5    matter?  To what extent -- more to the point, to what extent

6    will a witness go to perpetrate a fiction?

7              That's what happened here.  Mr. Payne and Mr.

8    Reynolds, polished as they were, created a fiction.  They, for

9    example, said that there is full communication, they called it,

10   between the Bakken and Three Forks pools, like those pools were

11   some sort of a geologic autobahn, like minerals traversing

12   freely between the two.  They even state that those two pools

13   are like a two-story house.  That's the example they gave you.

14             There's no evidence.  There's no peer review studies.

15   The Hess paper certainly didn't find anything regarding full

16   communication and a two-story house.  What happened instead is

17   that they're trying to posture it as it's either full

18   communication, their theory; or they say no communication,

19   plaintiffs here.  We don't say that.  It's not the science.

20             There can be communication between the two, but there

21   are problems inherent.  In fact, it is impossible to say that

22   that's the case throughout the Bakken for numerous reasons,

23   including one being about 40 feet of hard shale between the two

24   pools.  Forty feet is the equivalent of about six of me

25   standing on each other's shoulders to reach to the ceiling.

1   That shale that is the center of the Bakken, it's separating

2   these two pools.  That's a fiction.

3          Now, we don't need, though, to rely upon

4   Mr. Akinboyewa's testimony regarding the extent of

5   communication because the government now concedes the point

6   themselves.

7          This is a federal regulation with the preamble to it

8   that I'll be discussing in a bit.  Operators in the Bakken --

9   Bakken, Three Forks -- and the Three Forks' pools, plural -

10  plural, pools - are currently subject to a 91 percent gas

11  capture requirement.  This is the BLM in its words.  It refers

12  to these pools in the plural, as separate, consistent with -- a

13  hundred percent consistent with Mr. Akinboyewa that says there

14  can be such a thing as communication, i.e., the Bakken and

15  Three Forks pool, but this is -- this is their record and it

16  eviscerates this entire fiction.

17         They too -- take that down.  Thank you.

18         They too say that our clients are -- meaning the

19  government, were fixated on pressure.  Pressure is the

20  inevitable driving force of drainage.  We can recall certainly

21  Mr. Laborda in testimony on my cross that they certainly didn't

22  expect, testifying vividly how drainage can occur half a

23  continent away due to pressure under the right conditions.

24         But Mr. Payne and Mr. Reynolds and now the government

25  too attempt to create this illusion that pressure is somehow

1   irrelevant.  To get to that outcome, determinative point, they
2   say that oil company operators don't keep pressure data.  That
3   is like saying a federal judge will not have a bench copy of
4   the Federal Rules of Evidence at arm's length during a trial.
5   It just doesn't happen.  Oil company operators, in fact,
6   monitor pressure on a daily basis.  They could not
7   hydraulically fracture without knowing what the pressure is.
8        They are then reduced to applying a volumetric
9   approach that measures ultimate recovery of hydrocarbons,
10  ultimate production, but not the source of flow.  And what's
11  interesting when they do this analysis and measure production
12  but not flow, they say that since pressure data was not
13  available, we used the data that was available.  Your Honor,
14  that's like losing your keys in the garage, but looking for
15  your keys in the kitchen because the light is better.  It
16  doesn't make any sense.
17        So what they're doing is using a volumetric approach
18  that by definition scientifically, objectively cannot measure
19  fluid flow.
20        THE COURT:  It -- doesn't the drain -- I understand
21  you're saying that this is not enough to meet the fiduciary
22  obligation, but doesn't the drainage manual contemplate using
23  the volumetric approach and maybe not getting pressure data,
24  it's not -- not required?
25        MR. STEFFENHAGEN:  I wouldn't say that because

31

1    pressure data was, in fact, the first --

2            THE COURT:  Yeah, but it says "may consider"

3    whatever.  It gives them a lot of discretion to decide, you

4    know, which -- which data to consider, so I don't -- I don't

5    think it was required.

6            MR. STEFFENHAGEN:  Well, it kind of gets back to

7    whether a manual is a fiduciary standard or not.  I won't

8    repeat that.

9            But to address that question, it was more instructive

10   what Mr. Laborda testified, because I didn't plan on him giving

11   all of these admissions.  But when he was on the stand, it was

12   fascinating to see how it evolved because he said himself that,

13   "Yeah, if I had pressure data, I would have used that."  So

14   they're not saying it's irrelevant.  They're not saying it's

15   wrong.  They're not saying it's not better.  Saying this is all

16   we had.

17           But that premise falls because they had every right,

18   contractual and by regulation, to open the oil company

19   operator's books even without notice.  They could have shown up

20   at an office and demanded to look at pressure records, and they

21   didn't.  So when they say that, yeah, this is the best we had,

22   that's another fiction.  Now, fictitious evidence, so to speak,

23   leads to bad results, and that's the bad results that they,

24   themselves, highlighted when they introduced the Hess diagram.

25           THE COURT:  Before you get to that -- trust me, I

32

1    don't want to get to that as much as I saw it so many times at

2    the trial.  Actually, it might be helpful.  Mr. Payne and Mr.

3    Reynolds also -- I think Mr. Payne testified that oil companies

4    don't look at pressure data when they're determining drainage,

5    so I guess you'd say that's not credible?

6          MR. STEFFENHAGEN:  I would say it's very much not

7    credible.  In fact, I would say that Mr. Payne himself admitted

8    in a more candid moment, as we cite in our reply brief, that

9    they do go down and measure pressure by the wellbores.  He

10   admitted it.  Mr. Laborda admitted it.  The only time they

11   won't admit it is when they want to try to, I'll say, influence

12   a factfinder with science that doesn't exist because life

13   experiences can't call them on it and say you're dead-flat

14   wrong and I know that from the fact that it's just not

15   commonsense.  The whole thing is a fabrication.

16         Now, I know that Your Honor doesn't want to look at

17   the Hess diagram because we heard a lot about it, so I'll keep

18   this --

19         THE COURT:  No, you can put it up.

20         MR. STEFFENHAGEN:  I understand.  And, Judge, I'm

21   joking.

22         But what they don't grasp about this, this was their

23   diagram, okay?  This was the Hess paper with the BLM, the

24   government boxes - they call them crosses - superimposed on

25   that.  This is what the government did.  That's what they

33

1    prepared.

2            What that exhibit showed is that purple crimped box,

3    that was the old two-story-house theory that they had.  That

4    showed intense pressure outside of the drainage crossing, and

5    that's after years of production.  It shows pressure depletion

6    far beyond the 200 feet that they accepted as a baseline from

7    the heel and toe because that's what oil company operators

8    said.  It shows pressure depletion thousands of feet from a

9    wellbore.

10           So what they say -- this is their exhibit.  They say,

11   "Well, Mr. Akinboyewa has a study that he likes."  That's how

12   they called it, a study that he likes, but it's not data.

13   That's what they're referring to.  That study that he liked was

14   a study that they used to like until they figured out that it

15   eviscerated their entire theory of drainage.

16           So the function of CA, the charitable and correct way

17   to say it is -- you can say are wrong.  What Mr. Payne did is

18   automatically exclude every CA from his drainage analysis if

19   drainage was occurring from a Birdbear tract to a tract in

20   which my clients had any fractional interest in a CA.  That's

21   completely contrary to the BLM drainage manual.

22           This is not a case of no harm, no foul.  He said --

23   Mr. Payne's testimony, we know there's draining, quote,

24   unquote.  Of course it's draining reserves from the Birdbear

25   tract.  Of course it is.  They know it's going on, and they get

34

1     the BLM manual only -- excuse me -- BLM manual wrong by

2     excluding it off the top.  That results in the impeachment and

3     discreditation of their entire drainage --

4          THE COURT:  I understood that they excluded it

5     because there would be no royalty, not because they were saying

6     there was no drainage or it was not necessary to look at

7     whether there was drainage, but because there were these

8     agreements, that even if there was drainage and accepting that

9     there was drainage, that they would have already received

10    royalties for their oil.

11         MR. STEFFENHAGEN:  Well, what they're saying is this.

12    We gave an example of how the Birdbears collectively owned

13    80 percent of the rights on one tract.  They were part of a

14    communization agreement that was draining an offending well in

15    which they owned a fractional percentage, 1 to 2 percent.  So

16    what was happening in that case was that 80 percent was funding

17    a CA in which my client had about a 1 percent interest.

18         So what Mr. Payne was saying is, I'm not going to

19    count that because you're getting paid royalties on that

20    1 percent.  That's illogical.  It doesn't make sense.  It's not

21    the law.  It's not the manual.  That's the level of discourse

22    that they had.

23         Now, Mr. Ollila, if anything, was worse on drainage.

24    This is a slide in Exhibit 324.  The offending operator has no

25    obligation to compensate the mineral owner for oil drainage.

1   This is part of the law of capture.  These add up to -- it
2   would not be possible for a professional to be more profoundly
3   wrong about the standards and the law on the Bakken.  He is
4   completely wrong in saying that the offending operator has no
5   obligation to compensate.  That's why compensatory royalties
6   exist.  They just never used it.  He is completely wrong when
7   he says it is the law of capture.
8           The law of capture goes back to the wild and woolly
9   days of whoever drilled first could drain for as far as they
10  possibly could.  That's why there are laws and regulations
11  designed to stop drainage and to stop the law of capture.
12          THE COURT:  Now, let me ask you about -- about this.
13          MR. STEFFENHAGEN:  Sure.
14          THE COURT:  It says the offending operator has no
15  obligation to compensate for oil drain.  Well, under the --
16  under the rules it's not the offending operator who has the
17  obligation to compensate, it's the lessee.  Do you see what I'm
18  saying?  So that -- I don't know anything about capture, but
19  maybe that's what he's talking about that's not necessarily
20  inconsistent with the --
21          MR. STEFFENHAGEN:  He's really not, though, because
22  there's a separate exhibit that we quote in our brief where he
23  says, basically, Roger Birdbear is going to be surprised when
24  he finds out he's not going to get any money from this, okay?
25  That is 100 percent wrong.

1          So with respect to the proper analysis, you have

2    Payne, Reynolds who's making up science.  You have Allen Ollila

3    who didn't understand the BLM's own obligations.  The correct

4    statement, however, is clear.

5          Now, I didn't mean to sort out Wendell Holmes or

6    Justice Ben Cardozo.  This is this Court's words in summary

7    judgement ordered, but the regulations clearly contemplate that

8    inaction by the United States in the face of the theft of

9    plaintiffs' mineral resources is not an option.  That was this

10   Court's ruling, and that's what happened in this case.

11         So Mr. Akinboyewa was -- did what the science

12   compelled.  What he did -- he didn't -- not do a simplistic

13   tank analysis.  He did a flow analysis.  He gathered and

14   assured -- given the absence of pressure data, he used as much

15   information -- publically available information as he could,

16   current reservoir pressure, the estimated pressure based upon

17   data in his own experiments.  He identified dozens of examples

18   of BLM records that he used where those variables were

19   reflected.

20         Payne, Reynolds, not coincidentally, agreed in large

21   part with Mr. Akinboyewa's analysis regarding such things as

22   the flow rates.  Mr. Akinboyewa is -- well, is not the sort who

23   is going to jimmy or doctor or slant data.  That too would be

24   repugnant to him, and he didn't in this case.  What he did do

25   is a flow analysis, a Darcy's equation, which they can't

1   dispute is the optimal, correct way to measure flow.

2          Moving on, venting and flaring.  We'll start this

3   analysis with a number.  That number is 60,798,218,000.  That

4   number is roughly 7.5 times the population of Planet Earth.

5   That number too is the cubic foot amount of uncompensated gas

6   flared and vented from allotted lands, as determined by their

7   own employee, up to 2015.  If you extrapolate from 2015 onward,

8   we're talking tens of billions more.  If you added tribal land,

9   according to Mr. Hunt, the employee that I referenced, you

10  could add another 28 billion to that figure.  That is the

11  amount of a saleable, valuable resource that the government

12  simply discharged into the air instead of requiring that it be

13  captured so that that resource could be paid to my client.

14  That's a violation.

15          I'll say this about Mr. Hunt.  When I was

16  cross-examining Mr. Hunt, I got the sense that he wanted to

17  tell me something.  I got the sense that he wanted to say

18  something, but he wanted me to ask the question first, and

19  eventually I did, and I asked him that.  And he testified that

20  that was -- about how he was concerned that the government was

21  doing nothing, how he was concerned that this was damaging the

22  environment, how he was concerned that this was cheating my

23  clients of resources.  He was concerned about all those things,

24  and like whistle blowers sometimes do, attempted to engage

25  others to fix the problem.  They didn't.

 1              In fact, their expert, Ronnie Martin, didn't even
 2    know that the document that the BLM used to address venting and
 3    flaring, NTL-4A, requires in certain circumstance prior written
 4    approval.  I had to point that out when I published it on the
 5    screen.  That's their expert.  Instead they gave you nothing
 6    but a spreadsheet to look at.  Defendant did nothing for
 7    decades.

 8              And here is a remarkable fact.  On the day that their
 9    brief is due to be filed in this case, the day, there's a new
10    regulation published in the Federal Register regarding venting
11    and flaring.  Now, I believe that coincidences exist on earth.
12    I believe that some of those coincidences may be serendipitous
13    in some respects, Your Honor.  That's not coincidence.  That's
14    not a coincidence.

15              After years and years and years, decades of inaction,
16    they publish it on the day their brief is due.  I guess my
17    client should in an offhanded sort of way be complimented
18    because the first thing the government did was in response to
19    this case.

20              Now, even those regulations don't save them from
21    judgment on venting and flaring.  They don't save them because
22    these regulations say nothing about 60 billion.  It says
23    nothing about cases where determinations weren't made.  It says
24    nothing about cases that the government knew about where
25    venting and flaring was occurring.  It says nothing of those

1  things.

2  So the final part of my opening segment will address
3  damages.  This is a dollar figure that is a starting point.
4  These are the dollar figures addressing royalties, addressing a
5  present-value calculation, addressing the meticulous
6  methodology that Jane Kidd applied to the equation.  So with
7  respect to each of the three categories that I mentioned, those
8  are the numbers that are in our brief, and I don't want to
9  focus on them so much as four salient points before I close
10  with the first part of my opening.

11  Number one, the foundational agreement between
12  experts regarding computation method.  Mr. Martin and Ms. Kidd
13  agreed on the method to compute the value -- the dollar value
14  of volume as Mr. Martin testified on the stand in response to
15  my cross.  The only difference would be that they were given
16  different volumes to compute.

17  Second, once the beneficiary has shown a breach of
18  trustee duty and resulting loss, the risk of uncertainty as to
19  -- as to the amount of the loss falls on the trustee.  That is
20  as it should be.  They were willfully -- I'm not even going to
21  call it negligent.  They willfully did not maintain data.  They
22  didn't request data, that they can't show -- they can't meet
23  their burden, as Mr. Payne said, of proving what he called the
24  right number because our federal government didn't find the
25  right number, and it didn't require the data.  So once my

1  clients have shown the existence of a loss and proof of a loss,

2  the risk of uncertainty rests with the government.

3          The critical importance of an accounting in aid of

4  judgment, let's look at it this way.  I talked before about a

5  theoretical 401(k).  If this were the case, I would get a

6  401(k) statement on a monthly basis about here's what my

7  account is, here's how much money is in it, here's the

8  percentage of all beneficiary duties, except these

9  beneficiaries.

10         These beneficiaries did nothing.  They got government

11  spreadsheets at trial without foundation.  They don't know

12  production.  They don't know pressure.  They don't know if it's

13  a true and full amount of drainage.  They don't know the amount

14  of production from offending wells.  They don't know whether

15  those wells on that exhibit that Mr. Akinboyewa prepared for

16  diligent development, whether the production numbers there are

17  accurate.

18         What they're doing is they, being the government,

19  requiring that my client accept things on face value.  That's

20  not the way the rules work in a court of law, with due respect.

21  That's not the way courts -- things work in the real world.

22  What is necessary in this case is those starting point numbers

23  for damages have to -- it is critical that my clients finally

24  have answers.

25         What would be the harm in giving data to trust

41

1   beneficiaries?  That data proves one of two things.  Either it

2   would prove to a certainty the amount of how badly my clients

3   have been damaged, or it would prove to a certainty that the

4   government can't meet its burden and thus that this Court

5   should look to the amount of the trust corpus, which Ms. Kidd

6   computed, without deduction for royalties of 326-plus million

7   because that's the law.

8        The Restatement of Trusts say that if a trustee

9   violates the duty, a duty, he is or she is required to restore

10  the trust estate and trust distribution to what they would have

11  been if the portion of the trust affected by the breach had

12  been properly administered.  That's the Third Restatement of

13  Trusts, Section 100.  That goes to the trust corpus.  So if the

14  government can't meet its duty and accounting in a judgment is

15  entered and they still can't get there, the remedy would be the

16  trust corpus at a minimum.

17       And I'll conclude by the fourth point, defendant's

18  unsupported theory regarding future damages.  What I understand

19  their theory to be is this:  Yes, if we breach our trust

20  obligation and didn't assure production of hydrocarbons, as a

21  result of our violation of our trust obligation, those

22  hydrocarbons still exist in the earth.  Consequently, you

23  haven't been damaged even though we violated our trust

24  obligation because they're still there.  Ergo, it is up to the

25  government to determine when, how they are, if ever, going to

42

1    produce and require production of hydrocarbons.

2           How long should my clients have to wait?  How long

3    should these people have to wait?  Should we wait until this

4    generation is dead and passed, at which point the government,

5    no doubt, will make some argument against their heirs, just

6    like the incorrect argument they made when Nelson Birdbear

7    legitimately transferred his interest on a go-forward basis to

8    his son?

9           How long do they have to wait?  Until there's dead

10   oil, until my clients have completely lost the time value of

11   money, until money -- excuse me, technologically enhanced

12   methods are required to make any production at all, which will

13   result in lower payments to my clients?  These are not

14   theoretical questions.

15          I think the government is making that argument too

16   hard.  It was their job to require production of the

17   hydrocarbon.  You don't get around that by saying I can violate

18   my duty, but still you haven't been damaged because that ends

19   up being like that blue circle that spins around

20   indeterminately on a laptop until it crashes.  It's circular.

21          So in conclusion as the first part, I'll say we've

22   proven the facts.  We've proven them despite obstacles.  We've

23   proven them despite difficulties.  We've proven that remedies

24   are in hand and that they are significant in this Court.  I

25   know that the Court is going to be in a hard place.  I made my

43

1    living in one.  I know that it can be unforgiving, but every

2    now and then there is a case in which it is not naive to talk

3    about justice, and it is not naive to talk about setting things

4    right.  These are the facts.  This is the case, and now is the

5    time.

6            THE COURT:  Thank you, Mr. Steffenhagen.  I think

7    maybe we should take a short -- a short break before the

8    government presents their argument, so why don't we take about

9    10, 12 minutes and we'll start at noon, okay?

10           (A recess was taken from 11:48 a.m. to 12:00 p.m.,

11    the same day.)

12           THE COURT:  Mr. McDaniel or Mr. Benson, I don't know

13    which one of you is --

14           MR. BENSON:  It would be Mr. McDaniel, Your Honor.

15           THE COURT:  I'm sorry?

16           MR. BENSON:  It would be Mr. McDaniel.

17           THE COURT:  Okay.

18           MR. MCDANIEL:  Good morning, Your Honor.

19           THE COURT:  Good morning.

20           MR. MCDANIEL:  My goal today would be -- closing

21    statement is to cut through the hyperbole as much as possible,

22    bring us back to what this case is really about.  This case is

23    about three specific claims that plaintiffs have brought

24    against the United States, and it's about whether the evidence

25    presented at trial supports those three specific claims or

1    doesn't support those three specific claims.

2         This case is not about whether communization

3    agreements are fair or not.  That's not a claim that was

4    brought by the plaintiffs.  This case is not about pressure

5    data.  The plaintiffs focused on that at trial and in

6    post-trial briefing and again this morning.  And it's certainly

7    not about internal e-mails that BLM and BIA -- although I will

8    discuss those later and I'll explain why this case is not about

9    internal e-mails like that.  And this case isn't only about

10   Mr. Ollila and his memory, which I'll also explain later.

11        This case is about these three claims brought by the

12   plaintiffs.  The first claim is that the United States breached

13   a duty to protect plaintiffs' tracts from oil and gas drainage.

14   That's Count 3 of their Complaint.  The second claim is for a

15   lack of diligent development on plaintiffs' tract.  That's

16   Count 8.  And the third claim is for uncompensated venting and

17   flaring outside of allowable parameters.  That's Count 12.  I

18   plan to walk through each of these three claims and explain why

19   the evidence shows that BLM met their fiduciary duties when it

20   came to the management of plaintiffs' tracts.

21        Before diving into each claim in more detail, first I

22   want to spend just a moment on the legal standard.  Plaintiffs

23   suggest that there's some dispute about the legal standard or

24   some ambiguity, but that's really not the case.  They don't

25   engage with the case law, and instead there's just kind of

1    unsupported claims that the government is using incorrect

2    standards.

3         In their post-trial reply brief they cite the 1984

4    *Jicarilla* case.  There's several *Jicarilla* cases that can be a

5    little bit confusing, but this 1984 *Jicarilla* case, it's a

6    district court case and a Tenth Circuit case, but it's not a

7    Tucker Act case.  It's a standard in the 1984 *Jicarilla* case

8    which isn't relevant.  And since 1984 the Supreme Court has

9    been clear about the standard of review, and it's explained in

10   our brief what that standard is.

11        For each of these claims the legal standard is the

12   same and it's straightforward and it doesn't come from Ovid or

13   any Roman poet.  It comes from what the Supreme Court says the

14   standard is.

15        Plaintiffs must first identify a substantive source

16   of law that establishes a specific regulatory or statutory

17   duty.  And then plaintiffs bear the burden of proving that the

18   government failed to perform those duties.  If plaintiffs prove

19   a breach of a duty, then they still must show that the breach

20   led to plaintiff suffering damages as a result of that breach.

21   That's the standard.

22        So applying that to the drainage claim, for example,

23   the question for the Court is whether BLM or BIA breached a

24   specific regulatory or statutory duty regarding potential

25   drainage and whether that breach then caused the plaintiffs to

1   suffer actual damages.  That's the question for the Court to

2   decide.

3          And it's the same for diligent development.  Did BLM

4   or BIA breach a specific regulatory or statutory duty regarding

5   diligent development in plaintiffs' tracts, and did that breach

6   result in actual damages?

7          So I'll begin with drainage.  I'll discuss how the

8   evidence shows that BLM and BIA met their fiduciary duties

9   regarding drainage protection for plaintiffs' tracts.  And I'll

10  explain how Mr. Akinboyewa's opinions fall far, far short of

11  supporting either a breach or damages related to drainage.  And

12  after that I'll discuss diligent development and flaring before

13  briefly addressing some secondary items at the very end.

14         The United States' duties regarding drainage are laid

15  out in a number of places, and that includes BLM regulations at

16  43 CFR Section 3161 and 3162.  And then there's the BLM

17  drainage manual for -- the 1994 drainage manual, which is Joint

18  Exhibit 92.

19         This Court addressed the duty for the United States

20  in the drainage context in its summary judgment opinion and

21  order in 2022, and the Court explains that there's first the

22  duty that falls on the lessee to protect from drainage.  And

23  that's set up by the regulations and the lease terms which

24  impose certain requirements on the lessee to protect the tract

25  from drainage.

47

1      There's then a secondary duty, as the Court

2  explained, that falls to BLM.  And BLM's duty is to take action

3  to enforce lease terms and monitor for and follow up on any

4  potential drainage situation.

5      This Court explained in that same opinion order that,

6  quote, BLM has discretion to choose which tool or tools to use

7  in response to drainage.  Those tools include drainage

8  investigation, technical and economic reviews, 60-day demand

9  letters.  The evidence shows that the agency met their

10  fiduciary duties to use these tools in response to any

11  potential drainage situation.  And I'll come back and explain

12  during -- explain exactly how they met their duties with

13  citations to the evidence.

14      But first I want to focus on the allegations that the

15  plaintiffs have made.  At trial and in their post-trial brief,

16  still here today, plaintiffs haven't been able to point to any

17  specific requirement that BLM or BIA failed to do with regard

18  to drainage.  Instead, it's just vague generalities about BLM

19  not meeting its fiduciary duty, but the burden is on the

20  plaintiffs to point to a specific statutory or regulatory duty

21  or requirement and show that BLM did not do that.

22      Instead, they have a list of complaints or grievances

23  that relate to drainage, and I'll discuss some of the

24  possibilities and explain why the evidence doesn't support

25  those complaints.  These include a supposed failure to maintain

48

1   drainage files - that's something that was alleged - a failure

2   to obtain pressure data, and then also a handful of internal

3   e-mails.  We saw some of those already today on the screen.

4          First, the plaintiffs have made the argument that BLM

5   has failed to maintain drainage case files.  This is a

6   resurrected argument that was also made with respect to

7   diligence files.  It was made again here today.  In the context

8   of diligence it was already rejected by the Court.  It just was

9   something not supported by the evidence and not something that

10  they asked for even in discovery.

11         But with regard to drainage case files, it's directly

12  contradicted by BLM testimony about keeping and maintaining

13  drainage case files.  For example, Mr. Ollila discussed

14  drainage case files in the transcript at page 348, and Mr.

15  Laborda and Mr. Bagley also discussed the fact that BLM created

16  and maintained drainage case files, but even --

17         THE COURT:  The government also didn't provide any of

18  those drainage case files for the Birdbear tract.  They didn't

19  -- you guys didn't introduce that into evidence, right?

20         MR. MCDANIEL:  Well, Your Honor, this here is

21  Plaintiffs Exhibit 392, which is a drainage case file for a

22  Birdbear tract.

23         THE COURT:  Oh, it is.

24         MR. MCDANIEL:  So this here is exactly the -- and you

25  anticipated my second-most important point, which is it's

49

1   absurd on its face to say that BLM didn't maintain drainage

2   case files and doesn't have drainage case files, and then for

3   the plaintiffs themselves to offer into evidence the drainage

4   case file, which is what this is right here.

5          So this is the cover sheet for a drainage case file

6   for Tract 1969.  This is the cover sheet.  The exhibit also

7   includes a number of things that are included in a drainage

8   case file.  The cover sheet has the lease number, it has the

9   well that's being investigated at issue here, it has the

10  preliminary analysis date.  Importantly, it has the date for

11  the demand letter that was sent out for the potential drainage

12  situation, and it has engineering reviews, economic reviews.

13         If you continue on in the actual file, it has maps,

14  technical information, it has actual engineering analyses

15  performed, and it has copies of demand letters that are sent to

16  lessees, so this is just one example here introduced by the

17  plaintiffs of the drainage case file.

18         A second argument that was put forward by the

19  plaintiffs is that BLM failed to seek out and obtain pressure

20  data and that this is somehow a breach of a fiduciary duty.  I

21  don't think I need to belabor this.  Your Honor already asked

22  about this earlier.  It seems to be based only on this, a

23  couple provisions from both the drainage manual and the

24  diligence manual that gives BLM a number of options for

25  performing the types of analyses they need to perform in

1    carrying out their duties.

2           So here, this is an excerpt from the drainage manual.

3    It's talking about BLM's ability to estimate ultimate

4    recoverable reserves from the well.  It says the method will be

5    determined by parameters available.  It may include a number of

6    different things.  And then it says there at the bottom, as

7    necessary, BLM should examine reservoir and fluid properties

8    from the wells as necessary - it says that in there twice - to

9    determine things like pressure history and then recovery

10   factor, permeability.  It goes on and lists like 10 or 12 other

11   things.

12          But the point about this is pretty simple.  This is

13   not an argument in support of a breach.  There's no basis in

14   law for it being a requirement that BLM failed to meet, and

15   there's no basis for somehow BLM breaching a fiduciary duty and

16   that leading to damages by not seeking out pressure.

17          A third complaint or grievance from the plaintiffs is

18   a handful of internal BLM and BIA e-mails.  Mr. Steffenhagen

19   included a slide that listed some of those in his statements

20   earlier this morning.

21          This slide here is Plaintiffs Exhibit 362, a e-mail

22   from Mr. Ollila to his boss, Mr. Wickstrom, from December 2013.

23   This is just an excerpt from the top portion.  Below that

24   there's some -- the chain of e-mails below that, there's some

25   e-mail traffic between Mr. Ollila and Mr. Birdbear.

1    Mr. Birdbear had called asking for some additional data.

2    Mr. Ollila tried to call him back.  Mr. Ollila then e-mailed

3    him with some explanation about these things.  And Mr. Birdbear

4    had followed up on that.

5         So in this forwarded e-mail from Mr. Ollila to

6    Mr. Wickstrom, Mr. Ollila says there at the bottom, "If I do an

7    analysis on this again, I'm going to puke."  An e-mail like

8    this could be interpreted, I think, in one of two ways.

9         First, it could be considered an employee who's

10   reasonably frustrated by devoting a disproportionate amount of

11   time and effort to one individual when he has duties to

12   thousands of other allottees, or it could be interpreted as an

13   unprofessional e-mail with an inappropriate comment that never

14   should have been sent in the first place.  I think it's

15   reasonable to think this e-mail as an employee expressing

16   reasonable frustration and circumstances.  But regardless of

17   what -- which way you interpret it, under either interpretation

18   this e-mail is not evidence of a breach of a fiduciary duty.

19        Next slide.  And there's some very important context

20   for this e-mail.  It's coming after all of these previous,

21   additional, above-and-beyond reviews performed by BLM.  Each

22   exhibit listed on this slide here is an additional review

23   performed above and beyond the normal drainage process review

24   like was embodied in the case file we saw earlier with BLM

25   following its normal process.  These are examples of BLM

52

1    performing an additional review at the request of -- for these
2    examples, it's Roger or Nelson Birdbear.

3          Joint Exhibit 118 is a 2010 drainage review that was
4    performed at Mr. Birdbear's request.  Joint Exhibit 119 is a
5    2010 review for Mr. Nelson Birdbear.  Joint Exhibit 127 is the
6    2013 in-depth Wunder report that we heard a lot of testimony
7    about during trial.  And then Joint Exhibit 45 is a 2013
8    drainage review for Mr. Nelson Birdbear.  So again, these are
9    all reviews performed by BLM at the request of the plaintiffs
10   above and beyond their normal process that they follow, and so
11   that's the context for the December e-mail -- December 2013
12   e-mail that Mr. Ollila is sending to Mr. Wickstrom.

13         The evidence at trial and the testimony of witnesses
14   like Mr. Ollila, Mr. Wunder, Mr. Laborda and Mr. Bagley shows
15   that BLM took all the necessary steps under the regulations and
16   the manual to monitor for and prevent drainage.  First, BLM
17   would identify all new wells drilled in the Bakken.  Mr. Ollila
18   testified about that process at transcript page 334.

19         Before I continue on with this slide in a summary
20   from the main evidence about drainage, I do want to make a
21   comment about Mr. Ollila because, well, he testified for two
22   full days or almost two full days.  So you heard all the things
23   he said over those two days.  He was attempting to remember
24   things that happened five, ten years ago, sometimes even two
25   decades ago in some instances at a time when he had already

1   been retired for several years.

2          The plaintiffs rely on him almost exclusively when

3   they cherry-pick certain snippets from his testimony that they

4   like, but then at other times they suggest that he's toeing the

5   company line.  You heard from Mr. Ollila for that time.  I

6   think the correct answer is that he was telling the truth as

7   best as he could remember it and also that he's not the kind of

8   guy to toe the line for the government if something is not

9   true.  And while plaintiff makes their case on certain snippets

10  that they want to pull out, if you look at the testimony

11  overall, what he told the Court is that BLM met its obligations

12  with regard to drainage and diligent development.

13         And one other thing about his memory in particular,

14  it -- it certainly is true, the consistent answer he gave when

15  asked about specific plaintiffs and specific leases is that he

16  could not remember things about specific individuals.  He also

17  coupled that answer over and over again with the response that

18  that's not how BLM did its job.  BLM didn't do its job knowing

19  which leases or tracts applied to any specific individual.

20         So if he was asked about whether BLM ever found a

21  lack of diligence on plaintiffs' tracts, the answer was, I

22  don't remember, and that's not how BLM did on process.  He

23  wouldn't have tied it back to a specific individual, so it's

24  just one explanation for why, you know, contrary to I think

25  what we heard this morning, "I don't remember" is not the same

54

1   as "it didn't happen."

2           So turning back to BLM's obligations and their

3   actions in this case, as I mentioned, first, BLM would identify

4   all new wells drilled in the Bakken.  BLM then performed

5   administrative reviews to determine the potential for drainage.

6   Those administrative reviews would involve analyzing initial

7   well production, well location, distance from other tracts,

8   whether a protected well had been drilled.  This information

9   was included in the drainage case file example from earlier as

10  an example.

11          BLM would close potential drainage reviews if a

12  potentially draining well was thousands of feet away from

13  another tract lease line.  This application of a, quote,

14  unquote, cutoff of 3,000 feet or 1,500 feet was a commonsense

15  approach to investigating drainage in this area.  Mr. Ollila

16  testified about this, and the United States' experts

17  corroborated it.  BLM did not see any drainage 1,500 feet out

18  from a wellbore, so this is just a commonsense approach to

19  investigating drainage.

20          After the administrative review, if BLM determines

21  there was a potential for a well to drain resources from a

22  neighboring tract, BLM would immediately send a 60-day demand

23  letter to the lessee.  Mr. Ollila testified about that also,

24  others -- other BLM employees did as well, and there's examples

25  of 60-day demand letters, including as part of the case file

1    that was on the screen earlier.

2            So undisputed trial evidence shows that BLM did send

3    these 60-day demand letters to the lessees of plaintiffs'

4    tracts.  The demand letter would identify a potential draining

5    well, remind lessees of their obligations to protect tracts

6    from drainage, and it would seek additional supporting

7    information.

8            Importantly, BLM would then perform its own technical

9    and economic reviews of potential drainage and not rely solely

10   on the operators.  Mr. Wunder testified about that, and his

11   testimony on the page is cited here.

12           The technical review would involve a volumetric

13   analysis, and the economic review would determine whether the

14   affected well would be economic for the lessee because that's

15   an important point as well.  Each of these steps is laid out in

16   the 1999 drainage manual which BLM followed with regard to all

17   of plaintiffs' tracts.

18           In fact, the drainage report that was written by

19   Mr. Wunder that we heard a lot of testimony about during trial,

20   it was chosen as a particularly good example in BLM's updated

21   2015 drainage manual because of how it adhered to BLM's

22   technical review process and how it embodied BLM's drainage

23   protection responsibilities.

24           THE COURT:  So I want to ask you the same question I

25   asked Mr. Steffenhagen.  So is it your argument that if BLM

56

1    complied with the provisions in the drainage manual, then it

2    necessarily met its fiduciary obligations?

3            MR. MCDANIEL:  I think actually we agree and disagree

4    with the plaintiffs on this, so the answer is the duty lies in

5    the statute and the regulations.  That's where the duty is.  So

6    the drainage manual or diligence protection manual, it's not

7    the end-all-be-all.  That is BLM's attempt to implement what's

8    in the statute of regs.  What's in the statute of regs, that's

9    where the duty is.

10           So what I would say, Your Honor, is that if -- if BLM

11   followed its manuals and guidance in this case, and that's what

12   the evidence shows, then absolutely it shows that they met

13   their fiduciary duty.  I would even say, but I don't think some

14   example of not following the guidance or the manual is

15   necessarily evidence of a breach, because the breach has to be

16   tied to the regulation or the statute.  In the drainage

17   context, the duty is in 43 -- especially in 43 CFR 3161, 3162.

18   That has the requirements.  That's really what it comes down

19   to.  That's the end-all-be-all when it --

20           THE COURT:  Right, but doesn't the manual sort of

21   represent BLM's view of how to meet the obligations in the

22   regulations?  Maybe it will say there are still other ways to

23   meet it, or something, still, but --

24           MR. MCDANIEL:  Just to answer your first question,

25   you know, more succinctly, absolutely if they followed the

1   manual and the guidance, certainly that means there's not

2   evidence of a breach in this case.  I do think there could be

3   circumstances where some subsection of a drainage manual or

4   diligence protection manual would not follow it to a tee, but

5   that doesn't mean BLM necessarily failed in their overall duty

6   which is embodied in the statute of regulations.

7            THE COURT:  Okay.

8            MR. MCDANIEL:  So this is what the evidence shows in

9   the case.  The evidence shows that BLM used the tools in its

10  power within the agency's discretion to address any potential

11  drainage from the plaintiffs' tracts.  And I want to quickly

12  tie this to actual examples rather than in abstract.

13           Slide 9 here explains Exhibit 564 zoomed in a little

14  bit.  It's a map of Tract 1969.  It's one of the tracts we

15  heard a lot about at trial.  The yellow well here to the south

16  is a potential drainage well that BLM identified.  The two blue

17  wells there are the wells that were drilled on Tract 1969.

18           BLM opened the drainage case for Tract 1969 in 2010,

19  so the same year at the same time that the potentially draining

20  well in yellow entered into production.  So BLM opened its

21  drainage case in 2010.  That's Plaintiffs Exhibit 392, same

22  cover sheet we saw earlier.

23           A 60-day demand letter was sent in November of 2010,

24  and that's referenced in the drainage case file.  Mr. Ollila

25  testified about it.  BLM performed multiple technical reviews

1   pursuant to the drainage manual to try and understand, okay,

2   what's the potential for drainage in this situation?  That's

3   also laid out in the drainage case file.

4           And then BLM performed its additional review in the

5   Wunder report, which is Joint Exhibit 127.  You'll recall that

6   the Wunder report concluded that there was potential for

7   drainage at some point in the future from the wells adjacent to

8   Tract 1969, and it made some recommendations about what to do

9   about that.

10          The Wunder report was finalized in February of 2013,

11  so that's when Mr. Wunder finished his drainage analysis.  Less

12  than one week later those two wells in blue were drilled on

13  plaintiffs' Tract 1969.  So less than one week after BLM made

14  its determination, okay, there's a potential for drainage, two

15  protective wells were drilled on Tract 1969.

16          Another quick example is Tract 710A.  This is

17  Plaintiffs Exhibit 562.  Again, this is one of the tracts that

18  Mr. Wunder looked at in his report in 2013.  So he completed

19  his report looking at potential for drainage less than a year

20  after this well in yellow to the -- to the west of Tract 710A

21  began production.

22          BLM then sent multiple demand letters to the lessee.

23  Mr. Ollila testified about that on page 351 of the transcript.

24  The lessee did not agree that drainage was taking place, but

25  BLM still persisted, telling them to either drill a protective

59

1   well or provide more information to support a conclusion that

2   drainage wasn't taking place.

3         Applications for permits -- permits to drill were

4   submitted and then produced by BIA and BLM.  Mr. Ollila

5   testified that BLM asked that the wells be moved up in the

6   drilling schedules.  And then two wells -- those two wells in

7   blue here began production on Tract 710A in 2015.

8         So these are two important examples for the

9   plaintiffs, but really they are prime examples of how the

10  evidence shows that BLM met its drainage obligations and

11  followed drainage regulations and guidance, and they're two

12  examples of how the system is working as it's supposed to.

13        First, the lessee has the duty to protect from

14  drainage.  That's in the lease terms and the regulations.  But

15  then BLM has a duty to follow up and ensure compliance, and

16  that's exactly what they did in these cases.  They performed

17  their own investigation.  They sent 60-day demand letters to

18  the lessee, and wells began production on the tracts.

19        Could we pull up Plaintiffs Exhibit 324 quickly?

20  Okay.  This was on the screen earlier.  I just wanted to

21  quickly address this.  This is the e-mail from Mr. Ollila

22  talking about the law of capture.  I honestly don't know

23  anything about the law of capture, but I think it's pretty

24  clear he's making a distinction here.  He says the offending

25  operator - that would have been the yellow wells on the

1    previous map, the operator of those yellow wells - has no

2    obligation to compensate the mineral owner.  That's part of the

3    law of capture.  Again, I don't know exactly what that means.

4          But he then continues, if our final review shows

5    drainage is occurring, we would send a demand letter to the

6    lessee of the lease saying drill a well, pay compensation, so

7    he's making that distinction between the operator and the

8    lessee there.

9          If we go to Slide 11, because the plaintiffs don't

10    have evidence of any actions or inactions by BLM or BIA that

11    amount to a breach, plaintiffs have no choice but to rely

12    solely on the opinions of their expert, Mr. Akinboyewa, to

13    support their drainage claim.  And this is borne out in their

14    post-trial briefing as well.  When it comes time to provide any

15    sort of legal argument about a breach regarding drainage, that

16    argument is completely based on Mr. Akinboyewa's testimony.

17          The Court should entirely disregard all of

18    Mr. Akinboyewa's drainage opinions.  The Court currently has

19    before it a ripe motion to exclude Mr. Akinboyewa's drainage

20    numbers under *Daubert* and Rule 702.  The Court should grant

21    that motion either now or as part of its final opinion and

22    order in this case.

23          There are a number of Rule 702 reliability problems

24    with Mr. Akinboyewa's testimony.  You'll recall the key

25    problem.  He apparently performed fluid flow calculations,

1  which we've heard about again today, to come up with his

2  drainage percentages and volumes, but he never provided

3  testimony about what values he chose for those calculations,

4  why he chose those values, and how those calculations were then

5  performed, so there's this gaping hole at the center of his

6  drainage analysis.

7          To really try and get at the core issue, consider

8  this example.  Mr. Akinboyewa says that a specific well,

9  Number 36261, is draining 3 percent from Tract 710A.  Not only

10  do we not know which values he chose to arrive at that

11  3 percent calculation, we can't even check to see if he did the

12  math right.  He could have carried the two in the wrong place

13  if he did those calculations, but we're not even able to do

14  that basic check of his math.

15          I'll just add one more point on this, which we made

16  in our briefing on the Rule 702 motion, but I think it's worth

17  highlighting again here.  The plaintiffs were allowed to

18  supplement their drainage analysis in 2023, and they

19  essentially doubled their drainage volumes, and it was based on

20  this argument that Mr. Akinboyewa has not changed his

21  methodology, he's doing the same thing he did before, he's just

22  supplementing and updating his numbers.

23          Our point at that time was that his methodology was a

24  black box.  There was no possible way to verify that, and there

25  was no possible explanation for how his numbers could have

1   changed so significantly and drastically.

2           Then at the end of December, December 2023, on the

3   eve of trial, plaintiffs finally tried to backfill and fix this

4   issue.  For the first time they provided some supposed backup

5   calculations to support his numbers.  The fact that we didn't

6   have these calculations back earlier in 2023 made it nearly

7   impossible for the Court to decide whether his new numbers were

8   a proper supplementation or not a proper supplementation.

9           So the only point I'm trying to make with this is

10  that the drainage value that took place before trial was

11  especially prejudicial because it was a significant factor in

12  Mr. Akinboyewa's new, much larger numbers being allowed in.

13          So we believe our *Daubert* motion should be granted,

14  as I mentioned, but even if the Court decides not to fully

15  exclude Mr. Akinboyewa's testimony, his opinions should still

16  be disregarded and not given weight.  They're arbitrary,

17  totally unsupported and completely ad hoc, and he was simply

18  not a credible witness.

19          Even now it's a little difficult to discuss with the

20  Court because of this black box that I mentioned.  We don't

21  know his assumptions.  We don't know the values he's choosing

22  to do his calculations.

23          That being said, we still know he's making some

24  fundamental flaws with his drainage approach, and these flaws

25  were discussed by the United States' expert geologist,

63

1   Mr. Reynolds, and Petroleum Engineer Mr. Payne.  And some of
2   these were conceded by Mr. Akinboyewa himself on cross.  One is
3   that he complains about the lack of pressure data, but also,
4   you know, apparently uses that as the fundamental piece of his
5   drainage analysis.
6           Another flaw is that he fails to account for
7   communication between the Bakken and Three Forks Zones.  This
8   is something that was brought up earlier today, and it was a
9   point during trial.  It's a simple idea.  A well drilled in the
10   Bakken Zone will produce oil from the Three Forks Zone and vice
11   versa in this manner because the thickness of the producing
12   zones directly impacts the lateral extent of the drainage area.
13           Mr. Payne testified about this diagram on page 1733
14   of the transcript, and he explains a 2,000-square-foot
15   one-story house is going to have twice -- twice the footprint
16   of a 2,000-square-foot two-story house.  It's a simple concept,
17   but it's a very important one if you're trying to determine the
18   lateral extent of the drainage area.
19           The analysis performed by the United States' experts
20   is in stark contrast to Mr. Akinboyewa's opinions.  Mr.
21   Reynolds testified about this graph and others like it during
22   his testimony.  Mr. Reynolds and Mr. Payne analyzed well
23   production and the interplay between wells, and that's what
24   this graph is showing.  This is actual science not ad hoc
25   conclusions.

1        By doing this analysis Mr. Reynolds and Mr. Payne

2    could conclude that there was communication between zones.

3    They could look at wells drilled in the Three Forks that are

4    near wells drilled in the Bakken, and they could see that those

5    wells were in communication with each other to prove that issue

6    of communication.  So they also cited peer-review studies that

7    supported this approach, but they had their own work to report

8    the idea of communication between zones and they performed

9    their own analysis.

10        They could also see that their drainage calculations

11   were borne out in the real world because wells drilled less

12   than 1,000 feet from each other simply didn't affect one

13   another, suggesting that drainage areas don't extend beyond 500

14   feet or so.  So if you have one well drilled in one location,

15   another well drilled a thousand feet away, they -- they

16   performed this analysis to determine that those wells were not

17   affecting each other in terms of production.  Therefore, the

18   drainage areas weren't overlapping between those two wells, so

19   it's a real-world analysis, a real-world check on their

20   drainage conclusions.

21        You heard testimony from the United States' experts

22   about their reliable, verifiable methodology to calculate

23   drainage areas.  Very quickly we'll go through this slide.  Mr.

24   Payne and Mr. Reynolds used the Hess paper diagram as an

25   example.  They calculated their own drainage area, which

1    overlaps very nicely with where Hess had modeled the prime

2    drainage area here.  Hess in a later paper, a second paper, did

3    an even more refined model that matches even more closely to

4    what Mr. Payne and Mr. Reynolds did.  I don't think there's

5    anything more to say about the Hess paper.

6         But turning back again to Mr. Akinboyewa, his entire

7    drainage analysis is flawed from the get-go because he doesn't

8    follow BLM's drainage guidance.  Your Honor recognized this

9    earlier this morning.  The drainage requirement -- drainage

10   guidance contemplates calculating a drainage area.  It says

11   calculate a drainage area, determine the configuration, and

12   then determine if that drainage area intersects a lease line.

13   That's -- that's what the guidance manual says BLM is supposed

14   to do to determine whether there's drainage.

15        Mr. Akinboyewa doesn't do that, and he admits that he

16   doesn't do that.  In fact, he even criticizes that approach at

17   transcript pages 1061 to 1062, so his failure to follow the

18   steps laid out in the drainage manual is another reason to

19   disregard his testimony.

20        On cross-examination Mr. Akinboyewa conceded three

21   other serious flaws with his drainage analysis.  The first is

22   that he acknowledged he did not account for communization

23   agreements in coming to his drainage conclusions.  The wells in

24   yellow here -- we're again looking at a map of Tract 1969.  The

25   well in yellow to the north of Tract 1969 along the lease line

1  is subject to a communization agreement, meaning that the

2  plaintiffs as mineral rights holders of Tract 1969 are sharing

3  in the royalties from production from that well.

4      Mr. Akinboyewa counts this well in yellow as a

5  drainage well, meaning the plaintiffs are being compensated and

6  being paid royalties for production from the wells north of

7  Tract 1969.  On top of that he is saying that that well is

8  draining resources from Tract 1969 and the plaintiffs are due

9  recovery for that drainage.  It's a sort of obvious example of

10  a double-recovery.

11      Production from that well is leading to royalties for

12  the plaintiffs.  To then account for drainage and pay twice for

13  those royalties based on how much drainage is coming from the

14  tract is -- it's just a clear, obvious double-recovery, and it

15  explains why Mr. Payne did not include those in any of his

16  drainage calculations.

17      A second and similar point is that Mr. Akinboyewa

18  includes plaintiff wells in his drainage calculations, so the

19  wells in yellow here, Well 37029, is a well that's traveling

20  through the plaintiffs' tracts, so it's a plaintiff well on

21  Tract 710A and 711B.  Plaintiffs are being paid royalties from

22  production from this well.

23      Mr. Akinboyewa then concludes that plaintiffs should

24  be paid twice by being paid for supposed drainage from Tract

25  3111A to the east here, but again, plaintiffs are already being

67

1  paid royalties for any oil and gas that's being produced from
2  this well, so it's another clear example of a double-recovery.
3          The last point is that Mr. Akinboyewa does not
4  account for plaintiffs' wells that he acknowledges under his
5  theory would be drain-free sources from a neighboring tract.
6  This is a slightly more nuance point, but if you look here at
7  Well 20103, which is a well highlighted in yellow on Tract
8  3111A, Mr. Akinboyewa conceded on cross that under his theory
9  of drainage, which is the drainage extends thousands of feet
10 beyond the well, this Tract 20103 would be draining resources
11 from the tract to the east of it, and, therefore, the
12 plaintiffs would be paid royalties for oil and gas that are
13 draining from another tract.  The well to the east, 20100, was
14 not yet drilled until three years later.
15         So again, under Mr. Akinboyewa's theories about
16 drainage, this well would be draining resources from another
17 tract.  The plaintiffs would be getting paid royalties for that
18 drainage, and Mr. Akinboyewa did not do any sort of subtracting
19 or debiting to account for that drainage that they're
20 benefitting from.
21         And I want to take an extra beat on this point
22 because I think it highlights a real flaw in the whole
23 exercise.  Even if his analysis of the physics was perfect, and
24 it's not for all the reasons we've discussed, plaintiffs'
25 entire drainage theory is not based on the real world.

1    Mr. Akinboyewa assumes BLM has complete power to put wells here

2    and there instantly, and it assumes that BLM can have perfect

3    contemporaneous knowledge about the extent of drainage at any

4    given time.

5         If Mr. Akinboyewa was right and these wells drain

6    thousands of feet out from the wells, then that would mean

7    there's drainage happening everywhere in North Dakota all the

8    time, and plaintiffs would be both hurt by and benefiting from

9    that drainage.

10        His approach suggests a false precision that's

11   consistent with an academic exercise, but not the real world,

12   and it's not consistent with BLM's duties and requirements

13   which are in the regulations.

14        So in the real world, what is BLM's duties and what

15   are BLM's requirements?  BLM is required to monitor each new

16   well for potential drainage, send out 60-day demand letters,

17   look at the economics of new potential protective wells, and

18   perform more in-depth technical reviews of drainage when it's

19   required.  The weight of the evidence shows that BLM did

20   exactly those things in this case.  In this case BLM followed

21   its rules and regulations and guidance, and in some instances

22   they even had operators on plaintiffs' tracts speed up their

23   drilling to get wells online even faster.

24        So plaintiffs' entire drainage theory is incorrect,

25   and Mr. Akinboyewa's testimony fails on a number of levels.  It

1   can't provide evidence to support that plaintiffs need to prove

2   their drainage claim.

3          I'll turn to diligence now.  The United States'

4   duties regarding diligent development are laid out in BLM

5   regulations at 43 CFR Section 3161, and then there's also the

6   Indian Diligent Development manual, which is BLM's attempt to

7   implement those requirements, and that's Joint Exhibit 109.

8          As with drainage, the Court recognizes summary

9   judgment that the duty first lies with the lessee.  Under the

10  regulations and lease terms, the lessee has a duty to

11  reasonably, diligently develop the tracts for the leaseholder.

12         Then secondarily, BLM has a duty to take actions to

13  enforce these lease terms and follow up to promote reasonable,

14  diligent development.  This Court in summary judgment describes

15  the duty as a duty to ensure that lessees exhibit reasonable

16  diligence in their development of mineral resources.

17         As with drainage, the plaintiffs again fail to

18  articulate what the breach by the United States actually is.

19  What requirement did the United States not do that they were

20  supposed to do that amounts to a breach of a duty, a statutory

21  or regulatory duty?  And the theory on this seems to have

22  changed over time.

23         The Complaint talks about preferential drilling

24  schedules as the reason why there's a breach of a diligent

25  development duty.  That's not something that was explored

1  during trial or included in post-trial briefing.

2          And then in the brief before trial there -- there's

3  this concept of timely protective wells, which is the inverse

4  of drainage.  If there's a potential drainage situation, then a

5  well needs to go in at the right time to protect from drainage,

6  and that was the theory about diligent development, but that

7  wasn't really pursued at trial either or the trial briefing.

8          Now the theory seems to boil down to there are not as

9  many wells on the plaintiffs' tract as they would like.  That's

10  not a breach of a statutory duty.  Instead of identifying or

11  explaining the breach, they again have a list of complaints or

12  grievances.

13          One can be dismissed, I think, very quickly, which is

14  a failure to maintain diligent review files.  During trial the

15  Court explicitly rejected this argument in its order.

16  Plaintiffs did not ask for diligent review files in their -- in

17  discovery, and so the -- if there was even lack of

18  production -- there wasn't a showing about that either, but if

19  there was a lack of production, there's no inference to be made

20  about them not existing.

21          And, in fact, the only evidence that's at -- that was

22  given at trial is opposite.  There's testimony that those

23  review files were kept by Mr. Ollila and then specifically by

24  Mr. Laborda.  So Mr. Laborda, who was at the Billings state

25  office, testified that until his retirement in late 2013, as

71

1  part of his job he performed reviews of the diligence and

2  drainage programs at the state offices, including North

3  Dakota's state office.

4         THE COURT:  So the -- your argument is -- are you

5  suggesting that there were diligent review files covering the

6  Birdbear tracts?

7         MR. MCDANIEL:  Yes.

8         THE COURT:  But why didn't the government bring them

9  in and introduce them into evidence, aside from the discovery

10  issue?  I mean as part of your affirmative case.

11         MR. MCDANIEL:  I would say two -- I would say there's

12  three responses, Your Honor.  One is that there was testimony

13  that they were kept, and so we did introduce testimony that

14  those diligence reviews took place.

15         THE COURT:  You did, but there were no files -- there

16  was a file from -- just to the Birdbear tract.

17         MR. MCDANIEL:  So the second response to that is that

18  it goes back to the sort of shifting theory over time about

19  what the idea of the diligent development breach is.  For

20  example, if the plaintiffs' theory is what it seemed to be

21  until recently, that there's -- that timely protective wells is

22  the issue, that's where BLM breached its duty, that there

23  weren't timely protective wells.  What that hinges on is the

24  existence of drainage, not some secondary diligent review

25  files.

1        And so it kind of leads into my third point, which is

2   it's the plaintiffs' burden to show what the breach is and make

3   a showing and meet the evidentiary burden to prove -- to prove

4   the breach.  If that -- if there's no evidence about that and

5   we're just sort of left guessing what the -- what the theories

6   are and responding to it, then, you know, that's not -- that's

7   not our job and that's not our burden.

8        THE COURT:  Okay.

9        MR. MCDANIEL:  The second category or complaint or

10  grievance that the plaintiffs point to that doesn't amount to a

11  breach is the supposed exemption for a diligence review

12  program, and it claimed that BLM stopped doing diligence

13  reviews.  This is based only on two documents.  It's based on

14  Plaintiffs Exhibit 423, which is that e-mail attachment, Word

15  document, and Plaintiffs Exhibit 189, which is an undated

16  electronic copy of a spreadsheet.

17       Plaintiffs Exhibit 423 has no author.  There's no

18  date.  There's no context for a passing reference to an

19  exemption.  In fact, the e-mail -- cover e-mail makes it clear

20  it's in the context of a hiring or staffing decision.

21       Plaintiffs Exhibit 189 is an undated electronic copy

22  of a spreadsheet.  There are lots of columns on this

23  spreadsheet.  In fact, the majority of it -- a majority are

24  just completely blank.  It's a, you know, pretty blank

25  spreadsheet.

1          Relying on these two documents as evidence of a

2    breach would require huge leaps of logic.  First, taken by

3    themselves, they have to be considered definitive about a

4    breach, some sort of breach of a duty.  And then there would

5    have to be this other logical leap that somehow this breach led

6    to plaintiffs suffering damages on their tracts, and plaintiffs

7    haven't even attempted to make that showing, to connect those

8    dots.

9          So at this point, again, I'd like to bring us back

10   from hyperbole and talk about the actual evidence in this case

11   and how it fits with the law.  BLM monitored every lease to see

12   if additional wells were needed.  Demand letters were sent out

13   to lessees if BLM determined the leases weren't fully

14   developed.  Those demand letters would ask for a development

15   plan.

16         Mr. Ollila testified that he personally performed

17   diligence reviews.  Plus, as I mentioned earlier, the BLM state

18   office, Mr. Laborda performed reviews of the reviews, so Mr.

19   Laborda -- and I think he even testified that he personally

20   visited the field offices, including the North Dakota field

21   office, to verify the existence of the diligence program and

22   diligence review case files.

23         This -- I also -- I think it's an important point to

24   demonstrate why the spreadsheet is a red herring.  The

25   particular electronic files, the undated spreadsheet only had

1   dates up to, I think, 2001, or so.  Mr. Laborda testified in no

2   uncertain terms that until his retirement, he was himself

3   personally performing reviews of the field office to make sure

4   they were doing their diligence reviews, and they were, so it's

5   just an extra reason why the spreadsheet is a red herring.

6           I want to address a couple facts about this timeframe

7   and the plaintiffs' diligence claim.  This was indisputably a

8   historic oil boom, and it's something that was recognized and

9   testified about, you know, by both parties.  Virtually all the

10  witnesses who testified talked about this historic oil boom.

11          And during this 2010 to 2015 timeframe, the evidence

12  shows that the reservation capacity for drilling wells was

13  maxed out.  This commonsense conclusion is supported by

14  testimony from all the BLM and BIA employees, and it was

15  corroborated by U.S. experts.  Mr. Payne especially talked

16  about this timeframe, and there are many different components

17  of this.

18          There are only a finite number of rigs available to

19  perform drilling on the reservation, and this is a time when

20  development -- development is exploding.  You can't magically

21  have rigs on location at any given time.

22          This also gets to this winter point, which I guess is

23  maybe an obvious point, but it's -- but it's a real point.  You

24  can't drill wells when the ground is frozen during certain

25  times of the year.  So if massive development is taking place

1    and massive drilling is taking place, that drilling is only

2    happening during certain windows in the year.  Now, operation

3    -- production can -- once you drill the well, production can

4    happen 24/7, all year, but the drilling of the well itself

5    actually, you know, can't happen all the time.  You need to

6    have the right conditions for that.

7          There -- Mr. Payne testified about the finite number

8    of drilling crews and fracking crews that were able to drill.

9    Applications for permit to drill had to be submitted, just

10   basic -- Mr. Payne testified about this as well, just basic, I

11   think, BLM employees, basic infrastructure needs during this

12   boom.  Roads had to be built to get to these remote locations

13   for drilling to take place.  You had basic hotel and other

14   infrastructure to accommodate all the workers coming to town,

15   so that's the backdrop for this e-mail here.

16         Plaintiffs Exhibit 313, it's an excerpt.  It's an

17   e-mail between Mr. Ollila and Mr. Wunder, so this is just cut

18   out of from that e-mail between those two.  And he says the

19   operators are drilling wells as fast they can get approved

20   permits and/or as fast as they can get rigs on the locations.

21   Thus, we believe the companies are being as diligent as they

22   can right now.

23         So the reason for bringing this up is just the

24   context for this e-mail.  And what is meant by this e-mail is

25   -- it's clear, which is development is happening as quickly as

1    it can happen.  Infrastructure, rig availability, all these
2    other things need -- need to come up to speed, and that's the
3    context for his statement here that we believe companies are
4    being as diligent as they can right now.
5         I want to contrast these real-world facts with the
6    plaintiffs' view of drilling on the reservation.  This slide
7    here is excerpts from Mr. Akinboyewa's testimony.  His
8    testimony and then the plaintiffs' briefing also reflects a
9    real misunderstanding of what BLM's role is.  I'll just quickly
10   paraphrase what's found here on the screen, he testified at
11   various points.
12        And you can determine, okay, as a petroleum engineer
13   for BLM, when would I place a well on a tract?  And that's how
14   my development work was done.  Then he says, the BLM has
15   control of when and where wells are drilled.  Later he says, I
16   looked at the development pattern through the dates of all the
17   wells popping in around the tract and determined in January, as
18   a petroleum engineer, I would put in a well in January of 2013,
19   a couple wells there.
20        This is a complete misunderstanding of BLM's duties
21   and even BLM's authority in this area.  If necessary, BLM is
22   tasked with taking steps to ensure that lessees reasonably
23   diligent develop -- diligently develop plaintiffs' leases.  BLM
24   is not tasked with drilling wells on its own or even ordering
25   operators to immediately drill new additional wells.

1    The regulations and BLM's demand letters require the

2    lessee to submit a development plan, which could take some time

3    into the future, so they don't contemplate some sort of

4    immediate drilling of wells that BLM makes -- even if BLM makes

5    a determination that there needs to be more done.

6    BLM is not tasked with ensuring that every tract gets

7    exactly the same number of wells as the tract next to it.

8    Nowhere in the regulations or the guidance documents does it

9    suggest that this is BLM's duty.  And this approach, again,

10   suggests this false precision that just isn't possible in the

11   real world.  BLM can't wave a magic wand and place wells here

12   and there instantaneously.  That's not how it works.  And they

13   don't have authority to do that even if they wanted to do that.

14   I'll turn now to Mr. Akinboyewa's diligent

15   development conclusions.  He employed an ad hoc process of

16   placing wells here and there.  He explained it only in

17   generalities and without support.  In the post-trial brief for

18   the first time it was described as an eight-step process.  This

19   is just an attempt to manufacture a coherent process and place

20   it on top of what Mr. Akinboyewa would testify about, but it's

21   not what Mr. Akinboyewa would testify to at trial.  It's also

22   not what he explained in his sworn declaration this past fall

23   during some of the briefing about his testimony.  I think at

24   that point it was a four-step process.

25   At trial his testimony about diligent development was

1  simply a hodgepodge of vague statements about tracts needing

2  more wells or his opinion that more wells should be placed here

3  or more wells should be placed there.  Then post-trial brief

4  for the first time we have this eight-step process, but it's

5  just an attempt to put a shiny gloss on an ad hoc, arbitrary

6  process that keeps changing, and the diligent development

7  numbers keep increasing.

8        As with drainage, the plaintiffs don't articulate a

9  specific diligent development breach, so the claim rests

10  entirely on Mr. Akinboyewa's testimony, and his opinions simply

11  aren't supported and aren't credible.

12        Even if the Court were to find some aspects of

13  Mr. Akinboyewa's diligent development analysis persuasive,

14  there's one very simple reason that his analysis and their

15  diligent development claim fails.  Mr. Akinboyewa didn't

16  consider the prudent operator rule in coming to his

17  conclusions.  The prudent operator rule is phased into a number

18  of different BLM regulations.  So 43 CFR 3162.2-1(b), that

19  requires lessees to drill wells when BLM finds they are

20  necessary to properly and timely develop the tract, but only,

21  quote, in accordance with good economic operating practices,

22  end quote.

23        And then the next regulation on the slide here

24  explains that a lessee is under no obligation to protect a

25  tract from drainage if it can show that drilling a well would

1    be uneconomic.  So the Indian Diligent Development manual

2    implements this requirement and these regulations by explaining

3    that BLM is tasked with assuring diligence, quote, consistent

4    with the prudent operator rule, end quote, and that's Joint

5    Exhibit 109.  And this is just commonsense.  As this Court

6    explained, BLM's duty is assuring reasonable diligent

7    development.  Requiring an operator to drill a well that loses

8    money would not be a reasonable development.

9            And in this context you have on the screen here

10   testimony from Mr. Akinboyewa where he says the standards that

11   an operator would apply, a prudent operator for economics, is

12   not one that necessarily favors the plaintiffs because they may

13   want higher rates of return, and they've demonstrated and

14   stated that.  So recognizing a prudent operator rule doesn't

15   work in plaintiffs' favor.  Mr. Akinboyewa ignored it, and that

16   by itself is enough reason to find that plaintiffs haven't met

17   their burden to prove a breach and damages regarding diligent

18   development.

19           Mr. Akinboyewa would try to explain this away and

20   then in opposing statements try to explain away as well by

21   saying that all of his hypothetical wells can be assumed or

22   guaranteed to be economical.  But this assumption of

23   feasibility just isn't enough for plaintiffs to meet their

24   burden, and it's -- and it's contradicted by testimony from BLM

25   and from the United States' expert, Mr. Payne.

1            Mr. Akinboyewa failed to consider any number of

2     factors that might affect the hypothetical wells he placed on

3     the tracts.  So Mr. Akinboyewa was questioned about this,

4     Plaintiffs Exhibit 570 here, which is a map of Tract 1963 in

5     particular, and Mr. Payne also testified about it.  There are a

6     number of different considerations that would have to be

7     accounted for in determining whether a well would be placed at

8     any given time.  Those include the terrain of the area.  You'll

9     see that there's a river to the east of Tract 1963.  It's a

10    rugged area.

11            Well pad location and costs, many times these wells

12    come out from a single well pad because you just drill one time

13    at the well pad, and that's where all the oil comes out from.

14    Operating expenses, those are not something that are uniform

15    and depends on infrastructure and crew availability.

16            And then there has to be an actual economic analysis

17    of the costs and projections associated with any hypothetical

18    well because wells are going to have different production from

19    one place to the next, and Mr. Akinboyewa himself discussed

20    that.

21            Mr. Payne in his career performed the sorts of

22    economic analyses that are necessary prior to drilling wells.

23    He actually performed those analyses himself to support the

24    drilling or not support the drilling of new wells.  He

25    testified on transcript pages 1759 to 1765 about all these

1   considerations, and his conclusion is that you can't just look

2   across the lease line to determine economic viability.

3        The last point to make about diligent development is

4   that Mr. Akinboyewa's conclusions don't pass the strict taste

5   test.  This here is Plaintiffs Exhibit 562.  I want to focus on

6   Tract 711A-B, as highlighted there in the middle.

7   Mr. Akinboyewa concluded that Tract 711A-B was due seven wells,

8   there should have had seven wells developed on it in 2013,

9   starting production in 2013.

10       This map here is a map that -- I think it's 2023, or

11  it could be December 31, 2022.  But either way, it's a map of

12  2022 or 2023.  If you just look at this map you can see a fair

13  amount of development.  It's dense in some places to the north

14  and to the west.  It's less dense to the southwest and less

15  dense to the east, but it's just -- looking at this map you

16  could maybe decide it's plausible that seven wells should have

17  been drilled on that Tract 711A-B.  Setting aside what the

18  regulations and statutes require, if you were just looking at

19  well density, you might say, okay, that seems plausible.

20       Next slide.  But this is what this area looked like

21  as of January 2013.  So this is the time period when

22  Mr. Akinboyewa says seven wells should have been placed on

23  Tract 711A-B.

24       So let me take even a step back from that.  As has

25  already been discussed, as the testimony shows, as the

1    regulations even contemplate, BLM can't magically place a well

2    on a tract instantaneously.  They can send demand letters to

3    lessees, and then there's a back-and-forth process where the

4    lessees can dispute BLM's determination that more wells are

5    due.  Lessees can even appeal that decision to the IBLA.

6           So what this would actually mean is that under

7    Mr. Akinboyewa's theory, BLM had a duty prior to 2013 -- so

8    sometime maybe in 2012, 2011, BLM would have had to send demand

9    letters to a lessee of Tract 711A-B and say we demand that you

10   put seven wells on this tract because we think that's what's

11   necessary to reasonably diligently develop that tract at a time

12   when all the tracts around have, you know, one, maybe two,

13   maybe three at the most wells going through it.  Many of them

14   have zero wells.

15          And so under Mr. Akinboyewa's theory, well, it

16   assumes perfect hindsight.  And, in fact, it's like even better

17   than perfect hindsight because it assumes that BLM should have

18   in advance of 2013 poured seven wells at a time when this was

19   the development that is around Tract 711A-B.  So his diligent

20   development numbers are, simply put, wildly inflated and they

21   aren't credible.

22          I want to briefly turn to flaring.  Our post-trial

23   brief discusses this in more detail.  For these closing

24   statements I'll just make three quick points.  First,

25   plaintiffs' Complaint alleged that the flaring breach was based

1    on this argument that BLM wasn't processing flaring
2    applications.  That's what's in the Complaint.  Plaintiffs
3    abandoned that theory at trial because the evidence shows that
4    BLM is processing those flaring applications.
5         Second, plaintiffs completely ignore the requirements
6    in NTL-4A.  That's the operative flaring guidance document.
7    They focus on only one piece and claim that flaring requires,
8    you know, advanced written approval.  And they ignore the plain
9    language, which at the very least includes a number of other
10   acceptable conditions for flaring, not just written approval.
11   And so they don't engage with that at all.
12        Third, plaintiffs presented zero evidence about
13   damages from flaring.  There's just an assumption that
14   virtually all flared or vented gas is both compensable and also
15   that it wasn't previously compensated for; in other words, that
16   plaintiffs weren't already paid for flaring.  They just make
17   the assumption.  There's no evidence of that.  So plaintiffs
18   haven't met their burden to prove a breach, and they certainly
19   haven't met their burden to prove any damages related to
20   flaring.
21        I have two final points to make, and both are
22   relevant only if the Court were to find breach of duty and
23   decide an amount of damages are warranted; otherwise, these
24   points aren't relevant.  The first point is that future damages
25   are not compensable, and the second is that interest is

1  precluded by law.

2        On the future damages point, the United States'
3  expert, Mr. Ronnie Martin, explains that royalties are only due
4  under the regulations when oil and gas is actually produced
5  from the ground and sold.  That's when royalties accrue.  And
6  allowing future damages creates some obvious double-recovery
7  problems.

8        So, for example, in the drainage context, plaintiffs
9  could be awarded damages for future drainage, and then tomorrow
10  a protective well could be drilled on their tract, and that
11  would completely alleviate the alleged drainage problem.
12  Mr. Akinboyewa even testified about that dynamic in his
13  testimony, that he tried to account for that, so he understood
14  that that was -- that was in play.

15        So if that were to happen, if plaintiffs were to be
16  -- were to be awarded damages for future drainage and then a
17  protective well would be drilled, they'd be paid twice for the
18  same resources.

19        And it's a similar idea with diligent development.
20  If they're paid future damages from royalties from hypothetical
21  wells that Mr. Akinboyewa said should be drilled, what happens
22  when real-life wells are drilled on the tracts?  Plaintiffs
23  would, of course, receive royalties from those real-life wells
24  in addition to the damage they receive from the hypothetical
25  wells.  And again, it's a clear double-recovery problem.

1    And then, finally, plaintiffs are paid future damages

2    relating to their mineral interest.  They could immediately

3    transfer those interests and no longer have them in the future,

4    and that's, of course, also what actually happened here in this

5    case.  Mr. Nelson Birdbear as a plaintiff is seeking recovery

6    of alleged past and future damages, and he no longer holds the

7    relevant property interest, so clearly the Court should not

8    allow recovery for a plaintiff who doesn't have the mineral

9    rights as a basis for a recovery.

10    And I'll address interest very briefly.  The United

11    States explains in its briefing interest is precluded in claims

12    against the U.S. - that's the law - unless there's a specific

13    statutory provision providing for interest.  In the post-trial

14    reply brief from the plaintiffs, for the first time we got what

15    the theory is for why interest should be awarded.

16    They rely exclusively on this *Wind River* case.  In

17    *Wind River* there was a specific statutory provision requiring

18    interest on all sand and gravel proceeds that was held by the

19    government, and so because of that the Court felt interest was

20    appropriate because the government was contractually obligated

21    to collect those proceeds.

22    But here there's not an obligation for the government

23    to collect and manage funds related to royalties or related to

24    diligent development or flaring, so our case is not like the

25    *Wind River* case at all.  There's not a legal basis for

1    interest.

2            So with that I'll conclude, Your Honor.  I'll point

3    you to our post-trial brief, which covers all of this in

4    greater detail, but I'll repeat the most important point.  This

5    case is about three specific claims, and the plaintiffs have

6    the burden to prove a breach of a specific regulatory or

7    statutory duty for each of these three claims.

8            Plaintiffs haven't been able to articulate what the

9    breach even is, much less make a showing that the weight of the

10   evidence supports the breach in this case.  So for these

11   reasons we request that the Court rule in United States' favor

12   on each of the three claims and enter a final judgment for the

13   United States.

14           THE COURT:  All right.  Thank you.

15           You didn't ask to reserve any time on rebuttal.  If

16   you want five minutes, I'll give it to you.  If not, that's

17   fine as well.

18           MR. STEFFENHAGEN:  I would very much like five

19   minutes.

20           THE COURT:  Okay.

21           MR. STEFFENHAGEN:  I'm going to focus on two major

22   areas within these five minutes.  First, we've heard again and

23   again about specific duties and money-mandating obligations.

24   This was specifically addressed in the summary judgment order

25   in which Your Honor went through it comprehensively, that there

1  are specific obligations, money-mandating obligations with

2  respect to each claim, but I want to use my time to do it this

3  way.

4          There are times when I listen to the government's

5  arguments and I think to myself -- and I read their argument

6  and I say, is this really what you want to say to these people?

7  For example, when they put up a spreadsheet at trial that shows

8  alleged amounts that my clients had been paid, a host of

9  objections sprang to the tip of my tongue.  It's irrelevant.

10  It's prejudicial.  It lacks foundation as to numbers.  It's

11  false.  It's not best evidence, but I let it go for a specific

12  reason.

13          I let it go because that proves the point more

14  forcefully than I ever could.  That was a straight shot to the

15  solar plexus of my clients' dignity because what the government

16  is saying and what they're saying here today is that we have

17  paid these people a lot of money and they don't deserve any

18  more.  They even called it in their brief, another massive

19  payday.  Really?  That's really what you want to say to

20  allottees who have suffered for generations?  Does United

21  States truly believe that it makes sense to start adding up

22  debits and credits about who is paid more to create a

23  historical ledger about how much indigenous people have paid?

24          Now, that argument comes from a highly educated group

25  of people, and I make no aspersions whatsoever towards them.

1   But imagine how Allen Ollila felt at the operational level.

2   Imagine the resentment that he felt working for his job

3   existence, to help people who they say now have been paid too

4   much.

5          It means something to have the Hidatsa language

6   spoken in court.  It means something to have Your Honor travel

7   half a continent to hear three hours worth of oral argument.

8   As one of my clients said, this means that we existed and that

9   we exist.

10         This is our government.  This is us, and we can do

11  better than this.  We pride ourselves on being a nation of law.

12  We pride ourselves on equality.  You can walk in any direction

13  in our nation's capitol and find a statue and monument and

14  plaques that extoll our equality because, after all, we hold

15  these truths to be self-evident, except -- except we can't say

16  that to the Birdbears.

17         Roy and Rosalie Birdbear gave their children a wealth

18  of gifts.  They were allottees.  They gave them a wealth of

19  gifts, but money was not one of them.  They were allottees.

20  They died poor, unrecognized and unseen.  Their parents --

21  Nelson's parents were the same.  They too died poor,

22  unrecognized and unseen.  This generation, these people before

23  you, others who have listened intently to every word in this

24  trial request to be seen.

25         THE COURT:  Thank you, Mr. Steffenhagen.

89

1              All right.  Well, we will adjourn, and I appreciate

2    the arguments.  They're very helpful, and I appreciate you all

3    coming here.  It's good to see you.  And I'm going to now

4    carefully review the arguments of both sides and do my best to

5    come out with a right and just result, so thank you all.

6              (Concluded at 1:12 p.m., the same day.)

7                    - - - - - - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF COURT REPORTER</u>

2            I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4            DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7            I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10           Dated:  June 4, 2024

11

12                        <u>/s/ Sandra E. Ehrmantraut</u>
                          Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25